Fabricant, J.
INTRODUCTION
This case arises from a failed real estate transaction. The disappointed buyer seeks an order of specific performance; the seller has counterclaimed for damages for abuse of process and other torts. Presently before the Court are the parties’ cross-motions for summary judgment on the plaintiffs claims. For the reasons that will be stated, the Court concludes that the defendant is entitled to summary judgment on those claims.[1]
FACTUAL BACKGROUND
The record presently before the Court consists of pleadings, affidavits, exhibits thereto, and excerpts from depositions. These items establish that the facts material to the plaintiffs claims are not in genuine dispute. The affidavits, particularly those of the attorneys who represented each side in connection with the proposed transaction, cast certain interactions between the parties in varying light, but, as will be explained, the Court concludes that they do not put any material fact in genuine dispute.
In the late fall of 1994, Richard Ho, as trustee, was the owner of an apartment building located at 15-17 University Road in Brookline. Ho was in default on a loan to the Shawmut Bank, secured by a mortgage on the building, and was facing imminent foreclosure, with a scheduled deadline of December 16, 1994.[2]
On November 10, 1994, Ho and Sanieoff entered into a purchase and sale agreement, under which Sanieoff would purchase the building from Ho for a total price of $920,000. The agreement was on the Greater Boston Real Estate Board’s standard form, with various modifications and riders. Its most significant provisions, for purposes of this dispute, were the following. Paragraph 8 provided that closing would occur at 2:00 p.m. on December 12, 1994, and, in the printed form language, “unless otherwise agreed upon in writing.” Paragraph 8 further stated, in the printed form language, that “It is agreed that time is of the essence of this agreement.” Paragraph 26 provided a contingency for the buyer’s financing; the buyer was to apply for a loan of $644,000, but if he could not obtain that amount, the seller would finance up to $100,000, at specified terms, secured by a second mortgage. If the buyer was unable to obtain the financing as specified, he could cancel the agreement upon notice provided by November 20, 1994. Paragraph 27 provided, in printed form language, that the agreement “may be canceled, modified, or amended only by a written instrument executed by both the SELLER and the BUYER.” Paragraph 17 of the rider provided that if the buyer’s lender “shall not have completed title examination or other matters in sufficient time to close on the closing date . . . the date for closing shall be extended to a business day as soon thereafter as practicable .. . but not later than the earlier of Buyer’s mortgage loan commitment expiration or 10 o’clock a.m. on the third business day after the scheduled closing.” Paragraph 18 of the rider provided that, if the closing occurred other than at the Registry, the proceeds would be held in escrow pending recording, “but in no event shall such proceeds be held in escrow later than noon the following business day.”
After execution of the purchase and sale agreement, Sanieoff proceeded to apply for financing. He did not have immediate success, and accordingly, through his attorney, Robert Fierman, he sought three extensions of the contingency date set in paragraph 26 of the agreement, first to November 22, then to November 25, and then to November 28. Ho, through his attorney, Anthony Leccese, granted each. Each of these agreed extensions was confirmed in writing by a fax from Fierman to Leccese.
By November 28, when the last extension of the financing contingency expired, Sanieoff still had not obtained the financing he needed to complete the transaction, and had requested a postponement of the closing date. Ho needed $224,000 to pay Shawmut Bank in order to avoid foreclosure. The two attorneys thus began discussing amending the agreement such that, in the words of Attorney Fierman’s affidavit, “the initially agreed upon closing date would be changed to a later date — as the buyer — had requested in return for which the plaintiff would lend the Defendant the funds necessary to satisfy the Baybank[3] loan through the additional deposit towards the selling price of the property.”
Leccese undertook to do the drafting of the proposed amendment. At his deposition, he testified that although it was the buyer who wanted the amendment, he did the drafting because “the seller’s attorney generally does,” and “just to control the terms.” He did not recall any discussion of the proposed amendment with Ho, but “it would have been unlikely for me to prepare something without having some discussion with the client about what was going on.” Because he *408 was “not in the habit of spending my time in needless exercises,” Leccese opined at his deposition that “there should have been some expectation that it was an agreement that could have been massaged so it could have been made mutually acceptable.”
Leccese sent Fierman three successive drafts by fax on November 29, December 6, and December 9. He faxed a copy of the December 6 draft to the broker and to Ho, but the fax to Ho was unsuccessful, and the document was mailed. At deposition, Leccese did not remember whether Ho responded.
Each draft provided, among other changes, that Sanieoff would pay additional deposits totaling $220,000 or $225,000[4] by December 12, which Ho would be free to use to pay Shawmut, with these funds to be secured pending the closing by a mortgage from Ho to Sanieoff. In return, each draft provided that Sanieoff would have the right, if his lender was not ready to close by the “current closing date of December 12, 1994,” to extend that date by a specified time.[5] The drafts also changed the provision for seller financing of the purchase, increasing the amount to up to $150,000, lengthening its term, and decreasing the interest rate.
On Friday, December 9, at approximately 11:45 a.m., Attorney Leccese sent the latest version of the proposed amendment, by fax, to the broker, with a copy to Attorney Fierman. His cover note stated:
Bob Fierman has approved the enclosed Amendment to Purchase and Sale Agreement. Please make two (2) execution copies and arrange for the Buyer and Seller to sign each on the second page. Apparently Bob is now holding the additional deposit and by copy of this fax, I ask that Bob confirm the same to us in writing. After the parties have executed the Amendment, please return one (1) original to me and the other to Bob. Please call with any questions. Thank you for your assistance in this matter.
Asked at his deposition whether he believed Ho would sign the amendment, Leccese said, “I certainly hoped that it was going to be signed . . . This was not an insubstantial change and the client was under considerable stress to sell the property and the buyer had asked for some changes to be made, and my recollection was this is the best we could do. And as the best we could do, again I sent it to the broker hoping that he could get it signed.” On the buyer’s side, the December 9 version contained terms that Attorney Fierman “understood [were] acceptable to my client.” Fierman was not, however, holding the full $225,000 in additional funds. He was holding some lesser amount, described in his affidavit as “in excess of $200,000,” which Sanieoff had deposited with him “on or before December 5.”
Both attorneys prepared for implementation of the amendment, and neither prepared for a closing to be held on December 12. Fierman obtained a title rundown, in preparation for his client receiving a mortgage from Ho to secure the $225,000 payment, and conferred with Leccese about issues identified by the title examiner. Leccese did not prepare a deed or closing agenda, or obtain certificates that would have been necessary for closing.
Fierman’s affidavit says that “[o]n or before December 7, 1994, attorney Leccese and I agreed to extend the time for closing pending the execution of the amendment, which I understood at the time was acceptable to both parties. In my view, attorney Leccese’s letter transmitting the amendment for execution communicated and confirmed the delay in, and necessity for an extension of time for, the closing.” He does not refer to any specific statement by Leccese in this regard other than the December 9 fax transmission. Attorney Leccese, in his affidavit, states that “[a]t no point in time did I or Mr. Ho ever represent that the closing would be extended other than pursuant to a mutually accepted and binding agreement.”
The amendment was not signed, nor was the $225,000 paid.[6] Neither party, nor their counsel, appeared at the Registry for a closing on December 12. Attorney Leccese’s affidavit says that “as of the date set for closing, no extension agreement had been executed, no additional deposit had been paid . . . and I had not received any communications from any attorney purporting to represent a lender to Buyer of such lender’s readiness to close. I formed the opinion that the Buyer was not going to proceed with the transaction on the closing date.” Ho’s deposition testimony was that “they are proposing new thing which I never agreed to. And also when I asked my lawyer whether they really have any deposit or any money transferred to my lawyer, there is none. And at that point I am concerned about the buyer could complete the deal at all, and there was no one calling for closing on December 12.”
On December 13, 1994, a new buyer, Michael Perry, offered to buy the property for $900,000.[7] Perry’s offer, with attached riders, set a closing date of January 26, 1995, but provided that a purchase and sale agreement would be executed by December 16, 1994, that an additional deposit[8] of $225,000 would be paid upon execution of the agreement, and that the deposit “would be available for use by the seller to pay off liens on the properly.” Ho accepted Perry’s offer on December 13, entered into a purchase and sale agreement with Perry on the 16th, applied Perry’s deposit to the Shawmut debt, and then closed with Perry in January of 1995. Sanieoff learned of Ho’s deal with Perry on or about December 15, from a bank loan officer: coincidentally, Perry applied for financing at the same bank where Sanieoff had applied.
Sanieoff filed this action against Ho on December 23,1994. His verified complaint refers to the purchase and sale agreement of November 10, 1994, and alleges that “[o]n or about December 9, 1994 the plaintiff and defendant agreed to extend the time for performance *409 until January 16, 1994. A copy of this amendment is attached hereto as Exhibit B.” Exhibit B to the verified complaint is a copy of Leccese’s December 9 fax transmission to the broker, along with the unsigned proposed amendment. The complaint then alleges that on December 16, Ho advised Sanieoff that he had another buyer and “would not convey the premises to him in accordance with their agreement.” The relief sought in the complaint is a declaration that “a valid and enforceable contract exists between the plaintiff and defendant by reason of the agreement of November 9, 1994, as amended December 9, 1994,” and an order of specific performance.[9] On January 20, 1995, Ho filed his answer and counterclaim, alleging that Sanieoff “knows specifically that the written contract . . . expired of its own terms” and “was not extended in writing,” that his request to amend the contract “was rejected by the seller," and that his suit constitutes the use of “lawful process to accomplish unlawful purposes” and has caused Ho actual harm. The counterclaim seeks damages on theories of abuse of process and intentional interference with advantageous business and contractual relationships.
DISCUSSION
This Court grants summary judgment where the record establishes that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass. R Civ. P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that it is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the non-moving party’s case or by showing that the non-moving party is unlikely to submit proof of that element at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The non-moving party cannot defeat the motion by resting on its “pleadings and mere assertions of disputed facts . . . .” LaLonde v. Eissner, 405 Mass. 207, 209 (1989). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment.” Pederson v. Time, Inc., supra at 17. “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial" and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., supra at 711, citing Celotex v. Catrett, 477 U.S. 317, 322 (1986).
In his present motion, Sanieoff abandons the theory alleged in his complaint, that the December 9 version of the proposed amendment to the purchase and sale agreement was agreed to and took effect, so that Ho was contractually obligated to wait until January 16 for closing. He concedes that the amendment was never executed by the parties, that Leccese had no authority to bind his client to the amendment, and that he himself did not pay the $225,000 additional deposit that was to be paid upon execution of the amendment.
Sanieoffs present theory, rather, is that in the course of the negotiations between counsel regarding the proposed amendment, and particularly by transmitting the December 9 version to the broker with instructions to obtain signatures, Leccese agreed, and thereby bound Ho, to extend the time for closing for some indeterminate period “pending the execution of an amendment to the purchase and sale agreement.” Under that agreement, Sanieoff reasons, he was not obligated to close on December 12, and his failure to do so did not constitute a default and therefore did not release Ho from his obligations under the agreement. Thereafter, he argues, Ho could have placed him under a duty to close on a fixed date by setting a new closing date, within the bounds of reasonableness, whereupon a failure by Sanieoff to close would have been a default and would have released Ho. Having failed to set a new date, Ho remained bound, and his sale to Peny was in breach of the agreement. Ho responds that no such agreement to extend ever occurred, and that Sanieoffs failure to close on the date set in the agreement released Ho from all obligations under the agreement. He points out that the only agreement to extend the closing date that was ever contemplated involved a very substantial consideration for the extension, in form of the $225,000 additional deposit, and that Sanieoff never paid those funds. Ho argues that the undisputed facts establish that neither he nor his attorney ever agreed, or ever even discussed, extending the closing independent of that consideration.
Based on all the materials submitted, the Court concludes that Ho’s position on the facts is correct. It is clear, and Sanieoff does not dispute, that the timing of the closing, or at least payment of $224,000, was not merely “of the essence” in a formal sense, but was absolutely critical to the value of the transaction for the seller. Ho needed the money to avoid foreclosure; if he did not have it by Shawmut’s deadline, he would lose the property, suffering the attendant financial losses, and would be unable to sell it to Sanieoff or anyone else. Both the agreement itself, and the undisputed conduct of all parties, reflect this fact. The various provisions recited supra ensured that closing would not be delayed beyond, at the very latest, the third business day — that is, December 15, and that availability of the proceeds would not be delayed beyond noon of the day after closing. Clearly, Ho struc *410 tured the transaction so as to ensure that he would have the funds in time to pay Shawmut and avoid foreclosure. Ho agreed to three short extensions of the financing contingency, each confirmed in writing, but none of these extensions affected the closing date. When these dates had passed with Sanieoff still lacking financing, and Sanieoff requested an extension of the closing date, Leccese did not simply grant the extension. Rather, he drafted an amendment that would grant the extension only in return for Sanieoff providing Ho the funds he needed to pay Shawmut, by the date he needed them. There is simply nothing in the evidence Sanieoff offers to suggest that Ho, or Leccese on his behalf, ever even discussed extending the closing date other than in return for that payment.
Fierman’s statement in his affidavit, that he and Leccese “agreed to extend the time for closing pending the execution of the amendment,” read in context, is insufficient to withstand summary judgment, see Kourouvacilis v. General Motors Corp., 410 Mass. at 711, even assuming that Leccese had authority to bind Ho to such an agreement. Fierman does not cite any specific statement by Leccese as constituting such agreement, other than his December 9 fax transmission. In context, it is clear that Fierman’s assertion is not a statement of fact, but is merely his conclusion, drawn from the other facts set forth in the affidavit, particularly the course of the negotiations, the December 9 fax, and Leccese’s failure to prepare for a closing. Those facts do not support Fierman’s conclusion. The course of negotiations, and the December 9 fax, unequivocally connected any possible extension of the closing with Sanieoffs payment of the additional deposit; the two are consistently linked, with the one to be agreed to, if at all, only conditioned on the other. Leccese’s failure to prepare for a closing on December 12 adds no support to the inference Fierman draws, given the undisputed fact, known to all at the time, that Sanieoff could not have closed on that date. Under the circumstances, all involved knew that preparations for a closing on December 12 would have been entirely futile.
Sanieoff relies on Church of God in Christ v. Congregation Kehillath Jacob, 370 Mass. 828, 833-34 (1976), and Rex Lumber Co. v. Action Block Co., 29 Mass.App.Ct. 510, 516 (1990). Neither supports his position. In Church of God in Christ, although the initial purchase and sale agreement recited that “time is of the essence,” no consequence turned on the closing date comparable to the foreclosure that was looming here. When the buyer was unable to obtain the necessary financing, the seller allowed the initial closing date and a series of subsequent dates to pass, without requiring any further consideration, and without reasserting that failure to meet any of the subsequent deadlines would be considered a material breach. Under these circumstances, the Court held that the course of dealing between the parties had eliminated time as an essential condition, so that the seller could reinstate it only by express notice of its intention to do so. Here, there is no dispute, and all involved knew, that prompt closing, or at least prompt payment of a substantial portion of the purchase price, was essential to the seller’s interests in the transaction, and that delay would subject the seller to a catastrophic consequence. Nothing in the course of dealing between the parties ever changed this fact.
In Rex Lumber, the seller’s attorney expressly told the buyer’s attorney that the seller had agreed to extend the closing date. No consideration for the extension was sought or required, beyond the mutual extension. The buyer’s attorney sent a confirming letter, expressly requesting notification of any inaccuracy in the letter. The seller did not give such notification, and the buyer, relying on the understanding that the date had been extended, refrained from tendering performance on the original date. The delay did not pose any adverse consequence to the seller of the sort threatened here. Nevertheless, after the original closing date had passed, the seller disavowed the extension and took the position that it was released by the buyer’s default. On these facts, the Court held that the buyer’s attorney had apparent authority to agree to the extension on the seller’s behalf, that the confirming letter placed a duty on the seller to disavow that agreement in a timely manner, and that having failed to do so, the seller was bound. Here, nothing in Leccese’s conduct, as shown in the evidence considered in the light most favorable to Sanieoff, comes close to the express representation made by the seller’s attorney in Rex Lumber, nor can Leccese’s fax to the broker be considered in any respect comparable to the buyer’s confirming letter in Rex Lumber, given the completely different contents of the two writings. Moreover, Sanieoff cannot contend that his failure to close on the original date, like that of the buyer in Rex Lumber, was in reliance on the purported extension, since it is clear that he was unable to close on that date, extension or not.
Simpson v. Vasiliou, 29 Mass.App.Ct. 699 (1991), offered by Sanieoff at argument, provides no more assistance. The Court there held that “an oral extension of a closing date may be valid, notwithstanding a requirement in the purchase and sale agreement that any such extension be provided for in writing,” since “parties . . . may orally waive the requirement of a writing.” The Court’s conclusion here is not that the parties could not have done so, but that Sanieoff has failed to produce any evidence that they did.
The most the evidence presented here shows, considered in the light most favorable to Sanieoff, is that Leccese and Fierman both hoped and believed that Ho would accept the amendment by December 12, and that Sanieoff would come up with the $225,000 by that date, but that both turned out to be wrong on both counts. A factfinder might even infer that Ho was willing to accept the amendment as long as he thought *411 it was his only hope of avoiding foreclosure, but that at some point between December 9 and December 12, he learned of Perry’s interest, evaluated Perry as a better risk than Sanieoff, and changed his mind. The evidence presented, however, fails to show any basis on which a factfinder could reasonably conclude that Ho, or Leccese on his behalf, agreed to an indeterminate extension of the closing date in return for nothing except the prospect of further negotiation on the proposed amendment. Sanieoffs failure to tender performance on the date originally set was therefore a material breach,[10] and released Ho from any further obligations under the agreement. Accordingly, Sanieoff cannot prevail on his claim against Ho.
ORDER
For the reasons stated, it is hereby ORDERED that the plaintiffs motion for summary judgment on his claims against the defendant is DENIED, and the defendant’s motion for summary judgment on the plaintiffs claim is ALLOWED, and that judgment enter on the plaintiffs claim declaring that no contractual duties exist between the plaintiff and the defendant by reason of the Purchase and Sale Agreement between the parties dated November 10, 1994.
The defendant’s counterclaims remain pending, and the evidence and arguments submitted in connection with the present cross-motions do not address those claims. The parties shall therefore submit, within 30 days from the date hereof, a joint status report indicating how they propose to proceed with respect to the counterclaims.

 The cross-motions do not explicitly address the counterclaims, and the result the Court reaches on the plaintiffs claims does not necessarily determine the outcome of the counterclaims.

 Materials submitted by both sides establish the default, the imminence of foreclosure, and the knowledge of these facts by both parties. The December 16 date was supplied by counsel for Ho at argument; counsel for Sanieoff did not dispute the date, but did not concede that Sanieoff ever knew of that date.

 The parties agree that this was error; the creditor was Shawmut.

 The November 29 draft called for $20,000 upon signing of the amendment and $200,000 more by December 12; the December 6 and December 9 versions called for $225,000 upon signing.

 The November 29 draft said 25 days; the December 6 and 9 versions said until January 16, 1995.

 The present record does not indicate what communications, if any, occurred among the broker, parties, and counsel regarding the amendment after Leccese’s December 9 fax.

 Sanieoff asserts, and Ho does not dispute, that under Perry’s proposal he, rather than the seller, would pay the $25,000 broker’s fee, so that the net price Ho would receive was actually $5,000 more than he would have received from Sanieoff.

 An initial deposit of $25,000 was paid with the offer.

 The complaint also sought approval of a memorandum of lis pendens, which was allowed on December 29, 1994. Perry purchased the property subject to Sanieoffs claim.

 Ho apparently did not take the position that he was entitled to any remedy against Sanieoff for the breach, such as forfeiture of the deposit as liquidated damages, and he did not assert any counterclaim based on Sanieoffs breach. Rather, his position has been that the agreement expired, as it would have if Sanieoff had given notice under the financing contingency provision that he had failed to obtain financing and elected to terminate. Ho’s position in this regard may have had the effect of granting an implicit extension of the contingency deadline, along with a waiver of the requirement of written notice, so that any right he might have had to damages for breach has been waived.