Velis, Peter A., J.
The plaintiffs originally brought this action against the defendants, John Parigian (“Parigian”), a refinancing agent who is now a fugitive, and O. Roland Orlandi (“Orlandi”), a lawyer who is now deceased, alleging the wrongful diversion of the plaintiffs’ monies. In 2000, the Court (Fecteau, J.) entered a default judgment against Parigian and the plaintiffs now seek monetary damages against Orlandi’s estate[3] pursuant to the following claims, as will be explained below, which survive the death of Orlandi: partnership liability (Count I), money had and received (Count X), breach of contract (Count XI), negligence (Count XII), and violations of G.L.c. 93A (Count XIII).[4] Based upon the evidence introduced during a juiy-waived trial, the Court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
The plaintiffs, Peter Zichelle (“Zichelle”) and Timothy Norton, as trustee of Crossroads Realty Trust (“the Trust”), were the developers of “Crossroads Office Park,” a commercial office park in Leominster, Massachusetts.[5] Leominster Savings Bank financed the development, and construction commenced in 1988. In late 1989, Leominster Savings Bank went into receivership and the Federal Deposit Insurance Corporation (“FDIC”) took it over. At that time, the commercial office park was still under construction and the plaintiffs had received only $3.8 million of the $5 million in financing needed to complete the construction. The plaintiffs could not afford to make FDIC loan payments and Zichelle could not bear the cost of finishing the project with his own funds, so he decided that he needed the assistance of someone with experience and expertise to do a “workout agreement” with the FDIC, that is, to refinance the loan with the FDIC.[6] A local developer told Zichelle that Parigian was a “workout specialist.” Parigian met with Zichelle and told Zichelle that he would obtain refinancing for the development, and that he had an attorney in his office who could provide the necessary legal closing services.
In February 1990, Parigian and Zichelle met at Parigian’s office in Boston. Although Parigian was not a lawyer, he shared an office that displayed the sign “Law Offices” with Orlandi, whose practice primarily dealt with real estate matters.[7] Parigian and Orlandi shared the costs of common office space, a reception area and conference rooms, a copy machine, fax, and a telephone system. The receptionists and occupants of the office answered the shared telephone system, “Law Offices.” Parigian and Orlandi worked together as business associates, referring clients to each other, but each had his own stationery and secretary. Or-landi also occasionally provided legal representation to Parigian or Parigian’s clients or business for mortgage closings and real estate matters.
In March 1990, Parigian introduced Zichelle to Or-landi, who orally agreed to provide refinance and closing services for the plaintiffs’ development. Though Zichelle had hired another attorney to provide services for the original bank closing in 1988, Zichelle did not thereafter use any other attorney but Orlandi, except for a tax specialist on an IRS matter in 1993, until 1995 when Zichelle commenced this action.[8] Zichelle at all times and for varied purposes considered Orlandi his and the Trust’s attorney and was unaware that Orlandi had an attorney-client relationship with Parigian.
Between January 1990 and November 1991, Zichelle conversed about “progress” on the FDIC loan refinancing matter with Parigian on a monthly basis, either on the telephone or at the Boston office. Orlandi joined some of these meetings by teleconference. During this time period, Zichelle paid Parigian a total of $56,000 for bank and title search expenses and fees purportedly related to the FDIC matter, including a $10,000 check payable to Fleet Bank for what Parigian told Zichelle was a loan application fee.
When Zichelle met with Parigian and Orlandi in their shared office site between August and October of 1991, Orlandi told Zichelle that he needed a retainer to close the refinance loan. Zichelle subsequently paid Orlandi $20,000 in two installments. There was no written fee agreement between Zichelle and Parigian or between Zichelle and Orlandi for either of these payments.
In October 1992, Zichelle met with Parigian to talk about permits and the status of the FDIC matter. Parigian stated that he and Orlandi were close to obtaining permits and refinancing, but that Zichelle needed to start making “forbearance payments” to the FDIC in the amount of $34,000 per month structured *127 through an attorney’s trust account (“IOLTA”) as a condition of further negotiations and dealings. Zichelle proposed that he make the payments directly to the FDIC, but Parigian refused. Zichelle then asked for a meeting with Orlandi to confirm the propriety of this arrangement. At that meeting, with Parigian, Orlandi, and Zichelle attending, Parigian repeated what he had told Zichelle earlier, namely that the forbearance payments needed to be made in a timely fashion through an attorney’s trust account in order to have the FDIC structure a deal which would return the property to Zichelle. Zichelle told Parigian and Orlandi unequivocally that he wanted assurance from Orlandi that his payments would be in a secure account. Orlandi assured Zichelle of the propriety of the arrangement, agreed to act as an escrow agent and trustee, and described the safeguards of an IOLTA account. At the time of this meeting Zichelle understood the IOLTA account to be a “holy sacred account” and the arrangement with Orlandi to be an agreement to receive and disburse funds “in accordance [with] a trust.”
As a result of the two October 1992 meetings about the forbearance payments, Zichelle opened up a new account on behalf of the Trust dedicated to the FDIC process and entitled “Crossroads Office Park Management.” Zichelle subsequently made payments from this account starting on December 29, 1992, through February 24, 1994, in the total amount of $463,500 to Orlandi to cover the FDIC forbearance payments, $2,000 for legal services fees to Orlandi, and $27,000 to Parigian for additional fees for the aforementioned “workout.”
Parigian deposited all of Zichelle’s payments, including the two checks payable to banking institutions, into Orlandi’s IOLTA account. Orlandi gave Parigian permission to make deposits into his IOLTA account by either using his rubber deposit stamp or by writing “deposit only” on checks. Parigian, who had no checking account of his own at any time during any of these transactions, then wrote checks from Orlandi’s IOLTA account or asked Orlandi to write checks payable to Parigian personally or to persons or businesses to whom Parigian owed money, including bills for personal and luxury expenses. Orlandi, as the only authorized signatory on the IOLTA account, then signed the checks after determining if there were sufficient funds in the account. Zichelle was not aware of this arrangement.
From February 1990 to November 1992, out of the $519,048 Orlandi paid out of his IOLTA account, he paid Parigian $228,319, an average of $6,920 per month. FromDecember 1992 through May 1994, the time period when Zichelle was making the forbearance payments, out of the $557,000 Orlandi paid out of the account, he paid Parigian $272,250, an average of $13,430 per month and approximately double the amount he was receiving previously. Parigian made no payments to the Massachusetts Department of Revenue or the IRS.
From December 1992 to November 1993, Zichelle paid, per Parigian’s request, $34,000 monthly payments to Orlandi, plus a $1,500 monthly late fee charge because Parigian told Zichelle the FDIC wanted checks faster than Zichelle was paying them. However, when Zichelle began to press Parigian and Orlandi for bank statements as proof of the payments to the FDIC after Parigian’s projected October 1993 date to close on the refinancing had passed, Parigian reduced the monthly forbearance amount to $27,000 for the remainder of the payments.[9]
In February 1994, Zichelle increased his efforts to obtain information from Parigian and Orlandi by phone calls, certified letters and faxes, but he experienced protracted, increased difficulty in contacting them. When Zichelle went to the FDIC in person to review the records he learned to his dismay, to say the least, that Orlandi and Parigian had made none of the $463,500 in forbearance payments to the FDIC. After he received no written response, Zichelle, on behalf of himself and the Trust, sent G.L.c. 93A demand letters on August 10, 1994, and September 29, 1994, to Parigian and Orlandi asserting that Parigian held himself out as a partner of Orlandi and that Parigian and Orlandi misappropriated approximately $600,000 that the plaintiffs paid in fees and payments allegedly demanded by and required by the FDIC in order to refinance the FDIC loan. The letter also directed Orlandi to notify and make a demand for any and all malpractice insurance policy coverage available to him.
In October 1994, the FDIC called in the note for nonpayment of interest, took possession of the plaintiffs’ property, and collected $250,000 of rental income on the plaintiffs’ office park, which the FDIC applied to the interest which had accrued due to nonpayment over the fourteen-month period when Zichelle paid $463,500 in forbearance payments. Or-landi never provided any closing services and never transferred any funds to the plaintiffs.
Zichelle received no response to the G.L.c. 93A demand letters.[10] On November 4,1994, he filed a pro se complaint with the Board of Bar Overseers against Orlandi, and on January 18, 1995, he filed this action against Orlandi and Parigian. Orlandi appeared pro se from 1995 to 1999. Parigian had two successive lawyers representing him, but both had withdrawn by early 1997. At trial, Orlandi denied any agreement with Zichelle or knowledge of the forbearance payments or other arrangements with the FDIC. He claimed that his check-writing dealings with Parigian were in connection with an attorney-client relationship between himself and Parigian, a relationship that Orlandi had never disclosed in any form to Zichelle. The Court finds that Orlandi was aware that Parigian was involved in many dealings and negotiations with the FDIC on behalf of Zichelle and the Trust and, further, that Orlandi was aware that Parigian was receiving checks from “Crossroads Office Park Management.”
Parigian was deposed twice in this action. Prior to trial, he was convicted in the United States District *128 Court, District of Massachusetts on a separate matter, fled the Commonwealth, and remains a fugitive from justice. On January 18, 2000, the Court (Fecteau, J.) entered a separate and final judgment against him by default on all counts for $604,454, trebled to $1,813,362, plus interest and costs.
In November 1999, the Court (Toomey, J.) prohibited Orlandi from alienating or encumbering his only remaining asset, a rental condominium in Boston. After the conclusion of the jury-waived trial, Orlandi violated the Court’s pre-trial order by entering into a purchase and sale agreement with third parties. Upon the discovery that Orlandi, who died in August 2004, violated the restraining order, this Court (Velis, J.) entered a further restraining order against his estate and a real estate attachment on June 21, 2005.
RULINGS OF LAW I. Survival Statute
The Massachusetts Survival Statute, G.L.c. 228, §1, reads in pertinent part:
In addition to actions which survive by the common law, the following shall survive: ... (2) Actions of tort (a) for assault, battery, imprisonment or other damage to the person; ... or (d) for damage to real or personal property; . . .
In Massachusetts, contract actions survive while tort claims not falling within the exceptions listed in the Survival Statute do not. See Rendek v. Sheriff of Bristol County, 440 Mass. 1017, 1017 (2003); McStowe v. Bornstein, 377 Mass. 804, 806-07 (1979). The reasoning behind this principle is that “actions seeking the vindication of personal rights, in the absence of a statute, do not survive while those seeking redress for damage to property rights do survive.” Sheldone v. Marino, 398 Mass. 817, 819 (1986). Thus, claims for punitive damages abate, whereas claims for compensatory damages may survive. Harrison v. Loyal Protective Life Ins. Co., 379 Mass. 212, 216-17 (1979).
Our courts “have looked with disfavor on rigid procedural distinctions between contract and tort and are more concerned today with substance than with form.” See McStowe, 377 Mass. at 808 (construing legal malpractice claim as breach of contractual relationship between client and attorney which therefore survived attorney’s death). A cause of action in contract survives when it is founded upon an implied or quasi contract or an express contract. Treasurer Receiver Gen. v. Sheehan, 288 Mass. 468, 471 (1934).
Five of the plaintiffs’ claims survive the death of Orlandi because they are based on an alleged contractual relationship between the plaintiffs and Orlandi and upon the loss of the plaintiffs’ personal property as a result of the alleged conduct of Parigian and Orlandi. See Treasurer Receiver Gen., 288 Mass. at 471; Sheldone, 398 Mass. at 819; Harrison, 379 Mass. at 216-17. The Court now turns to those surviving claims: partnership liability, money had and received, breach of contract, negligence, and violations of G.L.c. 93A, §11.
II. Partnership Liability Claim — Count I
The plaintiffs claim that Orlandi was a partner of Parigian by estoppel and therefore that Orlandi’s estate is liable for the actions and damages caused by Parigian. The plaintiffs allege that Orlandi knew or should have known that Parigian and Orlandi held themselves out to Zichelle as each other’s partners or associates because they shared office space, staff, communications, and some other aspects of business practice, and by their apparent mutual authorization to act on each other’s behalf.
The common-law doctrine of partnership by estop-pel is codified by the Commonwealth in G.L.c. 108A, §16. See Standard Oil Co. v. Henderson, 265 Mass. 322, 326 (1928). To prevail under this doctrine, a plaintiff must prove four elements:
(1) that the would-be partner has held himself out as a partner; (2) that such holding out was done by the defendant directly or with his consent; (3) that the plaintiff had knowledge of such holding out; and (4) that the plaintiff relied on the ostensible partnership to his prejudice.
Brown v. Gerstein, 17 Mass.App.Ct. 558, 571 (1984). Failure to establish any of the above-listed requirements precludes recovery on an estoppel theory. Id. Evidence of “holding out” may consist of “words spoken or written or . . . conduct.” G.L.c. 108A, §16(1). See Gosselin v. Webb, 242 F.3d 412, 415 (1st Cir. 2001). “Thus, a plaintiff may establish the first two elements of his claim by pointing not only to what the putative partners have said, but also to what they did.” Gosselin, 242 F.3d at 415.
“Ordinarily, whether a partnership by estoppel exists is a question of fact.” Atlas Tack Corp. v. DiMasi, 37 Mass.App.Ct. 66, 68 (1994). Although it appears globally that Orlandi and Parigian had an “operation of sorts,” the Court finds that their business relationship did not reach the level of partnership. Parigian and Orlandi shared common office space, a reception area, and a telephone system in an office labeled “Law Offices,” but they had separate, private offices, stationery, and secretaries. Compare Brown, 17 Mass.App.Ct. at 572 (partnership by estoppel not established even where attorneys shared stationery bearing both of their names).
Zichelle claims to have relied on an ostensible partnership and the tacit consent of Orlandi. However, the Court finds and rules that Orlandi’s words and actions do not satisfy the “holding out” element of G.L.c. 108A, §16. See Brown, 17 Mass.App.Ct. at 572, quoting Standard Oil Co., 265 Mass. at 326 (“[T]he use of a person’s name in a business, even with that person’s knowledge, is too slender a thread to warrant a favorable finding on the consent element”). While the use of a trade name, such as “ ‘professional association’ may well suggest a partnership to the public,” in this case, Orlandi and *129 Parigian shared “law offices,” but did not share a trade name. See Atlas Tack Corp., 37 Mass.App.Ct. at 70. Additionally, Orlandi never held himself out as Parigian’s partner on “equal standing.” See Gosselin, 242 F.3d at 417 (where an attorney said he was “with” a law firm, the court determined that although “with” may be ambiguous, when viewed along with other evidence of “holding out,” it may convey to a reasonable factfinder that the defendant shared equal standing with the other attorneys who make up the “firm”). Moreover, there was no evidence that Zichelle was aware that Orlandi gave Parigian permission to make deposits into Orlandi’s IOLTA account until after litigation commenced, and accordingly, there was no reliance on the part of Zichelle with respect to this issue.
The evidence does not support a finding that Or-landi was a partner of Parigian by estoppel and therefore, the Court finds and rules that Orlandi’s estate is not liable to the plaintiffs for the Januaiy 2000 judgment entered against Parigian.[11]
III. Money Had and Received Claim — Count X
The plaintiffs allege that Orlandi participated in the misappropriation of approximately $600,000 of the plaintiffs’ funds through his actions, misrepresentations and negligence. “An action for money had and received lies to recover money which should not in justice be retained by the defendant, and which in equity and good conscience should be paid to the plaintiff.” Cobb v. Library Bureau, 268 Mass. 311, 316 (1929) (citations omitted); Rabinowitz v. People’s Nat’l Bank, 235 Mass. 102, 103 (1920). A claim “for money had and received is broad and includes all money received by the defendant which in equity and good conscience belongs to the plaintiff.” G.E. Lothrop Theatres v. Edison Elec. &. Co., 290 Mass. 189, 192 (1935) (trial court properly awarded compensatory damages to plaintiff to repay him for amount overcharged by defendant electric company). ‘The right to recover does not depend upon privity of contract, but on the obligation to restore that which the law implies should be returned, where one is unjustly enriched at another’s expense.” Rabinowitz, 235 Mass. at 103 (citations omitted). The receipt and possession of money belonging to another is itself sufficient for an action for money had and received upon the promise to repay it implied by law.” Looney v. Looney, 116 Mass. 283, 287 (1874). It is well established that an action for money had and received lies when money is paid by a person in consideration of an act to be done by another and the act is not performed. 66 Am.Jur.2d Restitution and Implied Contracts §172 (2006).
The facts show that Orlandi accepted a retainer from Zichelle to handle the FDIC closing and, after agreeing to serve as an escrow agent, Orlandi received and deposited both a legal services fee and funds belonging to the plaintiffs into his IOLTA account. The equities that arise in these circumstances follow from Orlandi’s failure to handle the FDIC closing or return the retainer fee and failure to make monthly FDIC payments or return the deposited funds to the plaintiffs. Further, Orlandi failed to produce any evidence that he negotiated with or otherwise represented the plaintiffs in refinancing their FDIC loan or that he performed any legal work for the plaintiffs in connection with the FDIC workout. The plaintiffs’ claim for money had and received succeeds because the retainer fee accepted by Orlandi and the funds received and deposited into Orlandi’s IOLTA account “in equity and good conscience belong! ] to the plaintiff.” See G.E. Lothrop Theatres, 290 Mass. at 192. The plaintiffs’ funds “should not in justice be retained” by Orlandi’s estate and should “in equity and good conscience” be returned to the plaintiffs. See Cobb, 268 Mass. at 316.
IV. Breach of Contract Claim — Count XI
The plaintiffs allege that Orlandi’s estate is liable for breach of contract based on (1) Orlandi’s oral agreement to assist with the FDIC “workout” engineered by Parigian, specifically to provide the legal closing services; and (2) Orlandi’s oral agreement to act as an escrow agent and trustee for the plaintiffs whereby he would collect funds from Zichelle for deposit into his IOLTA account and transmit them on behalf of the plaintiffs to the FDIC as forbearance payments.
In order to recover on a contract claim, a plaintiff must prove (1) an express or implied agreement, in writing or oral; (2) for valid consideration; (3) performance or its equivalent by the plaintiff; (4) breach by the defendant; and (5) damage to the plaintiff. Restatement (Second) of Contracts, §§1-5. See Singarella v. City of Boston, 342 Mass. 385, 387 (1961).
The Court finds and rules that a valid, oral contract existed between Orlandi and Zichelle, on behalf of himself and the Trust. The Statute of Frauds does not bar the oral contract between Orlandi and Zichelle because when the contract was made, it could have been performed within a year. See G.L.c. 259, §1(5) (1986). Massachusetts courts have consistently ruled that “ [t]his clause of the statute [exempting contracts capable of performance in a year’s time] applies only to contracts which by their terms cannot be performed within the year. It does not apply to contracts which may be performed within, although they may also extend beyond, that period.” Rowland v. Hackel 243 Mass. 160, 162 (1922).
In order to be enforceable, an oral contract, just like a written contract, must have ascertainable essential terms. Novel Iron Works, Inc. v. Wexler Construction Co., 26 Mass.App.Ct. 401, 408 (1988) (“There must be agreement on the essential terms of the transaction in order that the nature and extent of the partie’s obligations can be determined and, hence, enforced”). See also Simons v. American Dry Ginger Ale Co., Inc., 335 Mass. 521, 523 (1957) (meaning of oral contract must be ascertainable with reasonable certainty). The terms of the contract between Orlandi and Zichelle were agreed upon during several conversations between them, and are reflected in the conduct of both parties: Zichelle accepted Orlandi’s *130 offer to provide legal closing services on the FDIC matter and provided as consideration the $20,000 retainer, which Orlandi deposited into his IOLTA account; Zichelle accepted Orlandi’s offer to act as an escrow agent and trustee and provided as consideration the $2,000 in legal fees and $463,500 in forbearance payments in a series of checks written to Orlandi for deposit into Orlandi’s IOLTA account. See Kaarela v. Birkhead, 33 Mass.App.Ct. 410, 413 (1992) (“The deposit of the escrow funds constituted an acceptance of the escrow arrangement”).
Orlandi as party to this contract had an obligation of good faith and fair dealing with respect to performance, Anthony’s Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 471 (1991), and he breached the contract by his failure to perform or effectuate performance without any legal excuse, Realty Developing Co. v. Wakefield Realty Mixed Concrete Co., 327 Mass. 535, 537-38 (1951), when he failed to make the forbearance payments to the FDIC and failed to refund the monies paid by him for legal fees when Zichelle sent the demand letters.
The Court concludes that these monies were wrongfully withheld, that the breach caused damages to the plaintiffs, and the Court therefore awards damages in the amount of the $463,500 in escrow payments, plus the $22,000 in legal fees, plus interest at 12% per annum from the date of the filing of the complaint.
The Court further finds and rules that Orlandi’s estate is liable for consequential damages that resulted from special circumstances presumed to have been known by Orlandi. Boylston Housing Corp. v. O'Toole, 321 Mass. 538, 562-63 (1947). Consequential damages are damages that “flow according to common understanding as the natural and probable consequences of the breach and as such [ ] may be presumed to have been in the contemplation of the parties at the time the contract was made.” Id. at 562, quoting Bucholz v. Green Bros. Co., 272 Mass. 49, 54 (1930). Such damages do not arise “according to the usual course of things, from such breach of contract itself’ but can arise only as the consequence of circumstances known to the parties. Boylston Housing Corp., 321 Mass. at 563.
Specifically, the evidence supports an award of consequential damages equal to the five months of rents lost by the plaintiffs in the total amount of $250,000 when the FDIC foreclosed, took possession, and collected the plaintiffs’ rents because Orlandi had failed to send any of the forbearance payments to, or even negotiate with, the FDIC. Had Orlandi done this, Zichelle’s refinancing would not have been delayed beyond the expected and stated closing date of October 1993, and though mitigated by the fact that Zichelle paid nothing to the FDIC after the March 1994 payment to Orlandi, by the time Zichelle was able to secure alternate refinancing and settle with the FDIC, the FDIC had collected five months of rent at $50,000 per month.
V. Negligence Claim — Count XII
The plaintiffs allege that Orlandi owed a duly of care based on an attorney-client relationship with Zichelle, as an individual and on behalf of the Trust; that Orlandi breached this duty when he participated in the mishandling and misappropriation of funds belonging to the plaintiffs; and as a result, the plaintiffs incurred damages.
The essential elements of a common-law action in tort are duty, breach, causation (actual and proximate), and damages. Swift v. United States, 866 F.2d 507, 508 (1st Cir. 1989) (applying Massachusetts law). “To prevail on a claim of negligence by an attorney, a client must demonstrate that the attorney failed to exercise reasonable care and skill in handling the matter for which the attorney was retained; that the client has incurred a loss; and that the attorney’s negligence is the proximate cause of the loss.” Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C., 25 Mass.App.Ct. 107, 111 (1987) (citations omitted); see McLellan v. Fuller, 226 Mass. 374, 377-78 (1917) (plaintiff has burden of establishing fact of negligence or want of reasonable skill on the part of attorney and the actual loss or damages resulting therefrom). The court does not apply the economic loss rule to claims of negligence by a fiduciary, such as a lawyer. Clark v. Rowe, 428 Mass. 339, 342 (1998).
“The duty of care owed by an attorney arises from an attorney-client relationship. Existence of an attorney-client relationship is an element of a malpractice plaintiffs proof, and may be shown by an express contract, or it may be implied.” Miller v. Mooney, 431 Mass. 57, 60-61 (2000) (citations omitted). This Court has found that the plaintiffs and Orlandi had an attorney-client relationship, by virtue of the following facts: Orlandi served as Zichelle’s lawyer on matters not pertaining to this suit; Orlandi agreed to handle the plaintiffs’ FDIC closing and accepted a $20,000 retainer; and Orlandi agreed to serve as escrow agent and trustee for the FDIC refinancing and accepted for deposit into his IOLTA account a $2,000 legal services fee and a total of $463,500 of the plaintiffs’ funds. Therefore, Orlandi owed the plaintiffs a duty of care.
“The standard of care normally applied [in a malpractice claim against a lawyer] is whether the lawyer failed to exercise reasonable care and skill in handling the client’s matter, a classical tort negligence standard.” Clark, 428 Mass. at 341, citing Ryan v. Ryan, 419 Mass. 86, 89 (1994); Colucci, 25 Mass.App.Ct. at 111. Generally, expert testimony is required to establish that an attorney has failed to meet the standard of care owed under the particular circumstances, “unless the alleged malpractice is so gross or obvious that laymen can rely on their common knowledge to recognize or infer negligence.” Colucci, 25 Mass.App.Ct. at 111. In these circumstances, Orlandi has failed to exercise reasonable care and skill in handling the plaintiffs’ matters by failing to make the *131 monthly forbearance payments to the FDIC on the plaintiffs’ behalf and by failing to return the deposited funds and legal fees to the plaintiffs.
The Court concludes, first, that the alleged malpractice is “so gross or obvious” that the common knowledge of laymen will recognize or infer negligence in the acts of Orlandi. See id. at 112. Thus, no expert testimony is needed to establish Orlandi’s failure to exercise reasonable care and skill in handling the client’s matters. See id.
The Court further concludes that the plaintiffs have demonstrated that they have suffered damages that were proximately caused by Orlandi. The plaintiffs offer cancelled checks for (1) the $20,000 retainer of Orlandi to handle the FDIC closing, (2) the $2,000 legal services fee, and (3) $463,500 deposited into Orlandi’s IOLTA account. The Court finds and rules that Orlandi failed to handle the FDIC closing or make monthly payments to the FDIC or return any of the fees or deposited funds to Zichelle. Therefore, Orlandi proximately caused the plaintiffs’ loss of those monies.
Accordingly, the plaintiffs have met their burden of showing that Orlandi failed to exercise reasonable care and skill in handling the matter for which he was retained, that they incurred a loss, and that Orlandi’s negligence is the proximate cause of the loss. See id. at 111. The plaintiffs thereby prevail on their claim of negligence.
VI. G.L.c. 93A Claim — Count XIII
The plaintiffs allege that Orlandi violated G.L.c. 93A, §11, which provides a cause of action for damages to a person engaged in a business or trade for the unfair or deceptive acts and practices of another person in a trade or commerce. See G.L.c. 93A, §11 (2006). Specifically, the plaintiffs claim that Orlandi participated in acts of deceit, fraud, and misrepresentation by allowing Parigian to access and utilize his IOLTA account and by mishandling and misappropriating funds belonging to the plaintiffs. The plaintiffs claim that as a result of the actions, misrepresentations, and negligence of Or-landi, they incurred damages.
General Laws c. 93A, §11, provides a cause of action for damages to
[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or properly, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . .
If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two.
If the court finds . . . that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys fees and costs incurred in said action.
No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.
G.L.c. 93A, §11 (2006). Section 2, the substantive heart of G.L.c. 93A, provides that “(ujnfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” G.L.c. 93A, §2(a) (2006); see Heller v. Silverbranch Construction Corp., 376 Mass. 621, 624-25 and n.l (1978).
Both plaintiffs and Orlandi were engaged in the conduct of a trade or commerce during the controversy at issue. The plaintiffs were doing business as Crossroads Office Park, C.O.P. Management. Orlandi was engaged in the practice of law. The unfair or deceptive acts or practices of which the plaintiffs complain took place entirely within Massachusetts and principally at Orlandi’s Boston law offices. Therefore, the claim is properly brought under §11.
The facts demonstrating “unfair or deceptive acts or practices” in the conduct of trade or commerce are the same facts that support the plaintiffs’ breach of contract and negligence claims. The Court finds that Orlandi, with deceptive acts or practices, has violated G.L.c. 93A, §2. See Glickman v. Brown, 21 Mass.App.Ct. 229, 234-35 (1985) (negligent act, by itself, does not amount to a violation of §2, but deceptive act that is the result of a defendant’s negligence is actionable without more); see also Giannasca v. Everett Aluminum, Inc., 13 Mass.App.Ct. 208, 213 (1982) (“The Supreme Judicial Court has rejected the proposition that c. 93A requires a showing that the defendant’s unfair or deceptive act was knowing or wilful").
The Court finds and rules that Orlandi violated G.L.c. 93A, §2, by the following deceptive acts or practices: (1) Orlandi requested a $20,000 retainer from Zichelle for the FDIC closing, but failed to provide closing services or refund the $20,000; and (2) Orlandi agreed to act as escrow agent and trustee for $463,500 of FDIC forbearance payments deposited into his IOLTA account and charged $2,000 for legal fees for this matter, but failed to make payments on the plaintiffs’ behalf or refund the monies to the plaintiffs.
VII. Damages
A. Compensatory Damages
The plaintiffs, based upon the acts of Orlandi, are seeking the same compensatory damages against Orlandi’s estate in their claims of money had and received (Count X), breach of contract (Count XI), negligence (Count XII), and violations of Mass. G.L.c. 93A (Count XIII). “Where the same acts cause the same injury *132 under more than one theoiy, duplicative damage recoveries will not be permitted.” Szalla v. Locke, 421 Mass. 448, 454 (1995), citing Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 236 (1984) (permitting awards under several counts where the claims and injuries were factually distinguishable, but emphasizing that “where the same acts cause the same injury under more than one theory,” duplicative damages will not be awarded). The Supreme Judicial Court also held in Szalla that when a plaintiff was awarded the same damages under more than one verdict, the plaintiff must elect from among the counts. Szalla. 421 Mass. at 454, citing Colangeli v. Constr. Serv. Co., 353 Mass. 527, 531 (1968).
The plaintiffs seek compensatory damages for the counts of money had and received (Count X), negligence (Count XII), and violations of G.L.c. 93A (Count XIII) in the same amount as on the contract count. Additionally, in the count for violations of G.L.c. 93A, the plaintiffs seek multiple damages and attorneys fees and costs. Excluding the plaintiffs’ application for multiple damages and attorneys fees and costs, the Court interprets the plaintiffs’ requests on damages for the negligence, money had and received, and G.L.c. 93A violations as seeking compensation in an amount equivalent to an award under the claim of breach of contract and not as a request for duplicative damages. Accordingly, the plaintiffs are not entitled to compensatory damages for Counts X, XII, and XIII.
The Court awards plaintiffs compensatory damages for breach of contract (Count XI) in the amount of $463,500 in escrow payments, plus the $22,000 in legal fees, plus interest on those sums at 12% per annum from the date of the commencement of this action. See Ward v. American Mat Liability Ins. Co., 15 Mass.App.Ct. 98, 101 (1983). Additionally, the Court awards consequential damages in the amount of $250,000, plus 12% interest from the date of loss, for the five months of rents lost by the plaintiffs when the FDIC foreclosed and took possession of the plaintiffs’ properly due to Orlandi’s failure to send any of the forbearance payments to, or even negotiate with, the FDIC.
B. Punitive Damages
The plaintiffs are not entitled to double or treble damages for the willful or knowing violation of G.L.c. 93A, §2, because a claim for punitive damages does not survive the decedent’s death. See Harrison, 379 Mass. at 216-17 (after the death of the wronged or wrongdoer, the function of damage awards is compensatory). Because the purpose of multiple damages under c. 93A is to deter future violations of the statute, see Heller, 376 Mass. at 628, multiple damages are not applicable after the death of the wrongdoer, see Harrison, 379 Mass. at 216-17.
C. Attorneys Fees and Costs
The plaintiffs are entitled to recover reasonable attorneys fees and costs under G.L.c. 93A, §11. “In view of the compensatory character of attorneys fees, a claim for attorneys fees under ALM G.L.c. 93A and the award of the same against the defendant survives the death of the plaintiff.” Case Notes, G.L.c. 93A, §11 (2006), Lyon v. Triram Corp., 18 Mass. L. Rptr. 419 (2004). “(A]ttorneys fees are not [under c. 93A] the subject of doubling or trebling, so as to become punitive.” Rex Lumber Co. v. Acton Block Co., Inc., 29 Mass.App.Ct., 510, 522 (1990). Because the plaintiffs have demonstrated that Orlandi violated c. 93A, they are entitled to recover reasonable attorneys fees and costs incurred. See G.L.c. 93A, §11. The Court awards counsel fees and expenses to be determined upon Motion filed by plaintiffs’ attorney within thirty days.
ORDER
For all the foregoing reasons, it is hereby ORDERED that:
(1) With respect to the plaintiffs’ partnership liability claim (Count I), judgment shall enter for the defendants.
(2) With respect to plaintiffs’ money had and received (Count X), breach of contract (Count XI), negligence (Count XII), and G.L.c. 93A (Count XIII) claims, judgment shall enter for the plaintiffs in the amount of $735,500 with interest and costs and attorney fees as provided above.

Orlandi died subsequent to the final day of trial and his estate has been substituted as defendant for him.

The plaintiffs have waived the claims of conversion (Count IX) and deceit/fraud/misrepresentation (Count VIII).

The sole beneficiary of the Crossroads Realty Trust is Peter Zichelle.

A “workout agreement” is a mutual effort by a property owner and lender to avoid foreclosure or bankruptcy. Normally, the lender agrees to reduce the outstanding loan principal and extend the maturity date to reduce the debt service burden.

Parigian and Orlandi shared an office in three separate locations in Boston: Two Center Plaza from 1988 to 1991; 10 Tremont Street from 1991 to August 1993; and One Center Plaza from September 1993 until 1996.

Orlandi also acted as Zichelle’s personal lawyer between 1991 and 1994 on three other business matters. For example, between October 1991 and early 1992, Orlandi represented Zichelle’s steel erection business in labor disputes.

Additionally, Orlandi waived a fee for 1993-1994 Suffolk Superior Court litigation services for Zichelle at a time when Zichelle was pressing both Orlandi and Parigian for documentation regarding the purportedly scheduled October 1993 FDIC refinance closing.

Orlandi also failed to report to his malpractice insurer, Rollins Hudig Hall of Massachusetts, the claims made by Zichelle, as asserted in the 1994 demand letters, despite the fact that Orlandi had a $2 million “claims made” malpractice policy in effect at the time. By the time Zichelle finally identified Orlandi’s insurer, Zichelle asserts that the insurance company rejected the claim on the grounds that Orlandi had cancelled the policy on September 23, 1994.

 Accordingly, the remaining claims, to the extent that they are based on a theory of partnership liability, will not be discussed.