REX LUMBER COMPANY *vs.* ACTON BLOCK COMPANY, INC.[1]

No. 88-P-1153.

Middlesex. October 17, 1989. - November 20, 1990.

Present: ARMSTRONG, CUTTER, & DREBEN, JJ.

*Contract*, Sale of real estate, Modification. *Jurisdiction*, Specific perform-
ance. *Frauds, Statute of. Agency*, Attorney at law, Ratification. *Real
Property*, Sale. *Consumer Protection Act*, Availability of remedy, Un-
fair act or practice, Attorney's fees.

In a civil action, where the plaintiff demonstrated that it had relied on an
oral amendment to a written purchase and sale agreement that ex-
tended the time for performance, the Statute of Frauds did not apply
and, upon the defendant's wrongful refusal to convey the property
within the extended time period, the plaintiff was entitled to specific
performance of the agreement. [515-518]
Where a party to an agreement for the purchase and sale of real estate did
not disaffirm his attorney's oral grant of a change in the closing date to
the buyer, the buyer was entitled to rely on the extension of time for
performance of the agreement. [516-517]
The findings of a judge on a G. L. c. 93A claim were supported by the
evidence and warranted his determination that the seller of certain
commercial real property violated G. L. c. 93A, §§ 2 and 11, by refus-
ing to convey the premises. [518-520]
In a civil action the attorneys' fees and costs awarded pursuant to a finding
of violation of G. L. c. 93A were excessive, and the case was remanded
for reconsideration of that award. [520-522]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 20, 1984.

The case was heard by *Charles M. Grabau*, J.

*Gary S. Matsko* for the defendant.

*Brian E. Pastuszenski* (*Scott A. Birnbaum* with him) for
the plaintiff.

---

[1]Mr. Justice Cutter, a retired Justice recalled to active service pursuant
to statutory authority, joined in the disposition of this case. His term of
recall service ended before the opinion was issued.

ARMSTRONG, J. The defendant (Acton Block) appeals from a judgment ordering it to convey a parcel of land of 5.7 acres with a building thereon (the premises) to the plaintiff (Rex Lumber) pursuant to the terms of a purchase and sale agreement executed February 13, 1984. The judgment also ordered Acton Block to pay attorneys' fees in the amount of $98,000 plus costs of $13,750, based on a finding that Acton Block's conduct violated G. L. c. 93A, §§ 2 and 11.

The sale was to be of Acton Block's business premises, or, more exactly, the premises of its former business, which had been the sale of concrete blocks and masonry supplies. Business had dwindled over time, and, by 1984, when Rex Lumber became interested in acquiring the premises for the storage of lumber, Acton Block had been out of business for two years (although a commercial tenant occupied a part of the building). The owner, George DeLeo, was looking to the sale of the property to pay Acton Block's numerous debts and to provide for his own retirement. He signed the agreement for Acton Block. Lawrence Gagne, as vice president and treasurer, signed for Rex Lumber.

The closing was to be May 24, 1984, and time was stated to be of the essence. The agreement was subject to three conditions inserted for Rex Lumber's benefit. One would enable Rex Lumber to cancel up to May 15, 1984, if, despite due diligence, it had not obtained by then necessary permits to construct a paved access road from its (i.e., Rex Lumber's) adjoining land into the Acton Block premises. Another enabled Rex Lumber to cancel up to March 30, 1984, if zoning authorities should deny it permission to use the premises for outside storage of lumber. The third entitled Rex Lumber to test for toxic waste or other environmental problems, and, if cleanup were estimated to cost in excess of $5,000, to cancel on or before May 15, 1984. If such problems were present but the estimated cost should be $5,000 or less, that amount would be escrowed from the purchase price at closing and used for that purpose — any balance to be returned to Acton Block.

The tight schedule contemplated in the purchase and sale agreement was soon proved unrealistic. In March, 1984, revisions of the Acton zoning code were still in warrant form and were not to be acted upon until an April town meeting. The test borings contemplated by the environmental study contingency could not be performed due to the wetness of the soil in March. Ms. Kathryn Walsh, the attorney for Rex Lumber, also determined that it was unrealistic to hope to obtain permits for the access road by May 15. Accordingly, she requested extensions of time, including a new closing date of September 15, 1984, from Mr. Howard Gorney, Acton Block's attorney, who said he would have to talk to DeLeo. On March 29, 1984, Mr. Gorney telephoned Ms. Walsh and informed her that DeLeo had agreed to extend the notice dates for the contingencies to September 1, 1984, and the closing date to September 15, 1984. He repeated this in a telephone conversation the following day. Ms. Walsh offered to send a telegram memorializing the new dates. Mr. Gorney said that a letter would suffice. That day, March 30, Ms. Walsh by certified mail sent a letter addressed to Mr. Gorney "to confirm our telephone conversation . . . in which you agreed, on behalf of your client, Acton Block Co., Inc., to extend the date of performance and the contingency dates. . . to September 15, 1984, . . . and September 1, 1984[, respectively]."[2] The letter concluded: "If this does not conform to your understanding of our conversation, please notify me immediately." A copy was sent directly to Acton Block, which DeLeo received and read.

Several days later Ms. Walsh sent to Mr. Gorney a formal draft of the contract amendments to be signed by DeLeo and returned to Ms. Walsh. The dates had been adjusted to fall on business days (Friday, August 31, for the contingencies; Monday, September 17, for the closing). On April 17, Mr. Gorney sent the document to DeLeo with a cover letter stat-

---

[2]The letter also alluded to a request by Rex Lumber for an option to extend the closing date to November 15, 1984, which Mr. Gorney was to discuss with DeLeo, an option that was included in the draft of contract amendments sent to Mr. Gorney several days later.

ing that DeLeo should sign and return to Mr. Gorney "the amendment to the [p]urchase and [s]ale [a]greement which I had worked out with [Ms.] Walsh. . . ." This DeLeo received, but he neither signed and returned the document nor informed Mr. Gorney at that time that he would not do so. During this period Mr. Gorney was sending letters to Acton Block's creditors (with DeLeo's knowledge), informing them that the closing had been rescheduled to the middle of September. In late April there was a telephone conversation between the two attorneys. There was some talk concerning the environmental assessment. Mr. Gorney mentioned that he had not yet received the contract amendment document back from DeLeo, but there was no suggestion that the original May 24 closing date was still of concern.

The deal started to become unglued in late May. Ms. Walsh left on vacation May 18, not to return until May 30. On May 19 DeLeo telephoned Gagne to ask how things were progressing. Gagne, who had received the environmental assessment report, invited DeLeo to his (Gagne's) office to review and discuss it. The report indicated that there were problems with contaminants in the soil but did not estimate the cleanup cost. On conflicting evidence the judge found that "Gagne did not attempt to modify the agreed upon purchase price to reflect the costs of cleaning the contaminants from the site nor did DeLeo announce a refusal to close in September."[3]

On May 30 Ms. Walsh returned from vacation to find that the contract extension document had not arrived in her absence. She phoned Mr. Gorney and learned from him that DeLeo had refused to execute the extension and was taking the position that there was no longer an enforceable contract.

---

[3]Gagne's testimony was that he at no point suggested that Rex Lumber would exercise its option to back out of the agreement. DeLeo's recollection was that Gagne had emphasized that the cleanup problem was "serious" and asked DeLeo what he proposed to do about it. This DeLeo interpreted as a suggestion that, if he wanted Rex Lumber to complete the sale, DeLeo should offer to bear any cleanup cost. DeLeo's testimony came in through a deposition. By the time of the trial he was seriously ill, and he died shortly after its completion.

DeLeo would, however, still sell the property to Rex Lumber "as is," but any such sale would have to take place within a few days. Ms. Walsh stated her view that the agreement was enforceable as extended orally. She would talk to her client. Around June 4, Ms. Walsh phoned Mr. Gorney to say that Rex Lumber would be willing to purchase right away, waiving the contingencies, if the purchase price were reduced to $315,000. (The judge found that the $25,000 reduction was "to reflect the costs of cleaning the site of contaminants which Rex [Lumber] was to assume.") Mr. Gorney stated that the offer was unacceptable to DeLeo.

A week later Ms. Walsh called Mr. Gorney again to report that Rex Lumber was now willing to purchase the property forthwith for the original $340,000 price — again waiving contingencies. This offer too was rejected. (Ms. Walsh testified that reference was made to "bad chemistry" between Gagne and DeLeo.) On June 22, one Forrester, the president of Rex Lumber, wrote a conciliatory letter to DeLeo saying that Rex Lumber was satisfied on the subject of the contingencies and stood ready to purchase at the original price as soon as DeLeo should wish. This offer was not accepted.

On May 29 or 30, DeLeo had initiated discussions with one Pittorino, who had at some earlier time dismissed purchase of the Acton Block property. These discussions culminated at some time in a sale by DeLeo to Pittorino of the outstanding Acton Block capital stock on terms not disclosed.[4] Pittorino, who is now the president of Acton Block, uses the property for the storage of construction equipment and does not wish to sell the real estate to Rex Lumber. The stock sale did not affect ownership of the real estate, which remains Acton Block's. Acton Block has not (so far as the record shows) entered into any contractual or other arrangement that is inconsistent with Rex Lumber's rights, if any, to purchase the real estate.

---

[4]The timing and terms of the sale to Pittorino were excluded on Acton Block's objection. The exclusion was probably erroneous, as those matters were relevant to Acton Block's liability for unfair and deceptive practices under G. L. c. 93A.

## *Specific Performance*

Acton Block relies, first, on a line of decisions which hold that amendments to a contract that is within the Statute of Frauds are themselves within the Statute of Frauds, with the result that a party may not be made to comply with the terms of the amended contract unless he has signed a memorandum sufficiently indicating his assent thereto. See, e.g., *Cummings* v. *Arnold*, 3 Met. 486, 489-492 (1842); *Whittier* v. *Dana*, 10 Allen 326 (1865); *Rosenfeld* v. *Standard Bottling & Extracts Co.*, 232 Mass. 239, 245 (1919). See also *Johnston* v. *Holiday Inns, Inc.*, 565 F.2d 790, 793-796 (1st Cir. 1977), which discusses and applies this line of Massachusetts decisions. Under these decisions a party may rely on the orally agreed-to amendments only as a defense to a claim for breach of the terms of the unamended contract. *Id.* at 794-795. Here, the argument goes, the Statute of Frauds precludes Rex Lumber as plaintiff from enforcing the extension amendments that were never signed by DeLeo, despite the finding that Mr. Gorney orally indicated that DeLeo assented. Without the extension, it argues, as time was of the essence, the agreement expired on May 24, 1984, the date originally scheduled for closing. See *American Oil Co.* v. *Katsikas*, 1 Mass. App. Ct. 437, 440 (1973).

That line of cases, however, is subject to an exception, that a plaintiff may enforce a contract that falls within the Statute of Frauds which has been modified by an oral agreement to extend the time for performance, even though the plaintiff must rely on that extension to show his own compliance with the contract terms. It was so held in *Stearns* v. *Hall*, 9 Cush. 31 (1851).[5] Subsequent cases have followed the holding of *Stearns* v. *Hall* as it applies to extensions of time for performance of the contract. See, e.g., *Moskow* v. *Burke*, 255 Mass. 563, 566-567 (1926); *Siegel* v. *Knott*, 316 Mass. 526, 528-529 (1944); *Johnson* v. *Kelley*, 342 Mass. 724, 726

---

[5]*Whittier* v. *Dana*, 10 Allen 326 (1865), is distinguishable because the plaintiff in that case was suing under an oral modification of a contract subject to the Statute of Frauds and was not suing under the written contract. See *Johnston* v. *Holiday Inns, Inc.*, 565 F.2d at 795.

(1961); *Younker* v. *Pacelli*, 354 Mass. 738, 741 (1968); *Wesley* v. *Marsman*, 393 Mass. 1003, 1004 (1984); *American Oil Co.* v. *Katsikas*, 1 Mass. App. Ct. at 439-440. See also *Federal Deposit Ins. Corp.* v. *Slinger*, 913 F.2d 7, 13 (1st Cir. 1990). Thus, an oral agreement by DeLeo, speaking for Acton Block, to an extension of the closing date would have the legal effect of modifying that term of the written purchase and sale agreement.[6]

The judge did not find that DeLeo orally agreed to an extension of the closing date. His findings were that Acton Block's attorney, Mr. Gorney, *told* Ms. Walsh that DeLeo had so agreed, that Mr. Gorney had authority to speak for Acton Block in connection with the impending sale, and that DeLeo had notice, through a copy of Ms. Walsh's letter of March 23, 1984, that Ms. Walsh and, thus, Rex Lumber thought that such an extension had been granted. (The letter, we recognize, did not state that DeLeo had granted the extension; rather, it stated that Mr. Gorney had agreed to it.) Where DeLeo expressly denied orally authorizing an extension, we do not take the judge's carefully phrased findings as implying that he did. Nothing in the judge's findings contradicts DeLeo's testimony to the effect that he thought that his signature on the contract amendment document prepared by Ms. Walsh was essential to a legally valid extension of the closing date.

An attorney, absent express authorization, has no power to bind his principal by his assent to substantial modifications in the terms of a contract. *Torrao* v. *Cox*, 26 Mass. App. Ct. 247, 252 (1988), and cases cited. Yet it has been said that an attorney for a party to an agreement for the purchase and sale of real estate has apparent authority to agree to a change in the closing date. *Johnson* v. *Kelley*, 342 Mass. at 727. Doubtless the principal, upon learning what the attor-

---

[6]We need not discuss whether the same principle applies to the extensions of the contingency dates. The contingency provisions were intended to give Rex Lumber a means of voiding the contract if it should have given notice of the happening of a contingency by the date therein specified. No such notices were given, and Rex Lumber has expressly waived the contingencies.

ney has agreed to, may promptly disavow the modification, at least until others have relied on it to their detriment. See *Auringer* v. *Cochrane*, 225 Mass. 273, 275 (1916); *Boice-Perrine Co.* v. *Kelley*, 243 Mass. 327, 330-331 (1923)("It is the instant duty of a principal, upon ascertaining the facts, at once to disaffirm an act done in his name by an agent in execution of a power conferred but in a mode not sanctioned by the terms of the agency or in excess or misuse of the authority given. Prompt disavowal of such act is imperative because the inference of authority flows readily from the trust reposed by a principal in his agent"); *Irving Tanning Co.* v. *Shir*, 295 Mass. 380, 384 (1936)("Ratification of unauthorized acts of an agent is readily inferred where, after knowledge, the principal makes no effort to repudiate them"). See also Restatement (Second) of Agency § 94 (1958). Here we can assume that the judge intended in a narrow, literal sense his finding that Mr. Gorney had actual authority to speak for Acton Block: that is to say, that even though Mr. Gorney might have had no authority to negotiate an extension of the closing date for Acton Block, he at least had authority to inform Rex Lumber that Acton Block — i.e., DeLeo — had or had not given the necessary assent. Compare *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 732 (1974).

In either event Ms. Walsh, for Rex Lumber, was fully justified in assuming that the closing date had been extended; and she was justified in acting on that assumption until notified that Mr. Gorney had lacked authority to grant the extension and that DeLeo had not authorized the extension. DeLeo's refusal to execute the extension agreement, which the judge found to be intended as a formality only, did not put Ms. Walsh on notice that the oral extension may have been unauthorized. The tenor of DeLeo's objection at the time was that an extension could not be valid without his signature — a point on which, in light of the facts found, Ms. Walsh was correct and DeLeo mistaken. We hold that the effect of Ms. Walsh's letter of March 30, grounded as it was in Mr. Gorney's assurance that the extension was approved, was to cast on Acton Block the burden of denying

that fact if it wished to raise the question either of Mr. Gorney's authority or the correctness of his assurance that DeLeo had approved. Allowing the misimpression to stand uncorrected in these circumstances was tantamount to acquiescing in its accuracy, at least until it was corrected.[7] Without regard to his conclusion that the extension agreement was binding on Acton Block, the judge could reasonably conclude, as he implicitly did, that Acton Block's refusal of Rex Lumber's requests on June 11 and June 22, 1984, for a closing at Acton Block's convenience, with contingencies waived, was unreasonable and without right. Accordingly, the judge did not err in concluding that Rex Lumber was entitled to specific performance of the agreement.

### Liability Under G. L. c. 93A

The judge found "that DeLeo deliberately waited until the May 24, 1984, closing date had passed before having Attorney Gorney inform Rex [Lumber] of Acton Block's refusal to extend the closing date and honor the oral agreement." Finding that Rex Lumber relied to its detriment on the new closing date, the judge concluded that "DeLeo . . . acted in bad faith when representations had been made that the closing date had been extended and when he later refused to honor the extension. This is another case where there has been a 'pattern of conduct by one side which has dangled the

---

[7]For purposes of decision we assume that DeLeo could have countermanded the oral extension, even after initial delay, but equity would require that Rex Lumber should not be prejudiced by any misimpression created by Acton Block's own counsel. Compare *Cellucci v. Sun Oil Co.*, *supra* at 727-728. Prejudice could have been avoided by: (1) informing Rex Lumber that DeLeo had not orally agreed to the extension and that Mr. Gorney was not himself authorized to agree to it; and (2) allowing Rex Lumber a reasonable additional time to give notice under the contingencies and to close the transaction. On the facts found by the judge, prejudice to Rex Lumber was not obviated by (1) DeLeo's erroneous assertion that only a written extension could be binding and (2) giving Rex "a few days" after May 30 to close the purchase, apparently without regard to the contingencies. Rex Lumber's counsel was justified at that time in thinking that the oral agreement for closing on September 15, 1984, was binding on Acton Block and that a demand that the purchase be closed in early June, if at all, was without right.

other side on a string.' *Pappas Industrial Parks, Inc.* v. *Psarros*, 24 Mass. App. Ct. 596, 598 (1987)."

The judge could properly find that Acton Block's contract to sell its former business premises to Rex Lumber, despite being an isolated transaction, was entered into "in a business context" so as to fall within the scope of G. L. c. 93A. See *Lantner* v. *Carson*, 374 Mass. 606, 607-608 (1978)(G. L. c. 93A not applicable to transaction "strictly private in nature, and . . . in no way undertaken in the ordinary course of a trade or business"); *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 (1980)(transaction need not be in ordinary course of business so long as it takes place "in a business context"); *Lynn* v. *Nashawaty*, 12 Mass. App. Ct. 310, 312-314 (1981)(sale of a store and its inventory to a purchaser who intended to continue the store as a going business took place in a business context). Although Acton Block was no longer operating its own primary business, the property was commercial, and part of it was rented to a commercial tenant. Rex Lumber intended to use the property for commercial purposes.

Acton Block argues that the judge's findings concerning DeLeo's intention are clearly erroneous, belied by the facts that DeLeo was under great pressure from Acton Block's creditors[8] and thus needed a sale as soon as possible; that DeLeo honestly thought that any extension agreement required his signature to be effective; that, after the original May 24 closing date had passed, DeLeo offered Rex Lumber the opportunity to close the purchase on the original terms; and that Rex Lumber, in its initial response, sought to renegotiate the contract (i.e., to reduce the purchase price by $25,000), justifying DeLeo's inference that Rex Lumber no longer wished to complete the sale on the original terms and that he was free to negotiate with other prospective purchasers.

---

[8]These pressures are not mentioned in the judge's findings, but they are apparent from documentary evidence that is in the record, and their reality was not contested by Rex Lumber.

Were we the finder of fact, we might be inclined to agree and to conclude that this case involves only a misunderstanding of rights and obligations under a contract, not an instance of conduct "attain[ing] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). But there was evidence to support the judge's harsher evaluation of DeLeo's motives, that he deliberately concealed his intention not to sign the extension agreement and not to honor the extension agreed to orally until Rex Lumber, lulled by Mr. Gorney's assurances, should have allowed the original closing date to pass without a tender. The judge could reasonably doubt DeLeo's good faith in offering to complete the sale in early June, as he and Mr. Gorney knew at that time that Rex Lumber thought, correctly, as it turns out, that it had a binding contract to purchase in September, with the protection of still valid conditions intended for its (Rex Lumber's) benefit. The judge's finding of a G. L. c. 93A violation was not clearly erroneous.

### Attorneys' Fees and Costs

The judge, following the usual rule applicable to such cases, awarded specific performance without money damages. See *Sanders* v. *Bryer*, 152 Mass. 141, 143-144 (1890). Acton Block makes no contention that the absence of an entitlement to money damages precluded an award of attorneys' fees and costs under c. 93A,[9] and we do not consider that issue.[10] We agree, however, with the contention that the fees and costs awarded were excessive.

---

[9] See *Jet Line Servs., Inc.* v. *American Employers Ins. Co.*, 404 Mass. 706, 717-718 (1989).

[10] Acton Block argues that we should delete from the award the hours spent in researching the Statute of Frauds issue (seventy-two hours), preparing the trial brief (fifty-nine hours), which was primarily devoted to the Statute of Frauds issue, and preparing a draft of findings and rulings (sixty-two hours), which are said to have been largely transcribed from the trial brief. It is arguable that the Statute of Frauds question had only to do with the contract claim rather than the claim under G. L. c. 93A, but the judge indicated in his findings that Acton Block in effect conceded that the two claims were intertwined. See *DiMarzo* v. *American Mut. Ins. Co.*,

The attorneys' fee requested was $100,766.25, representing 1,059 hours of work by five partners (at rates billed from $78 to $210 per hour), six associates ($80 to $110 per hour), two summer associates ($45 to $60 per hour), and seven paralegals ($38 to $70 per hour). The expenses for which reimbursement was sought totalled $13,757.34, of which $6,272.94 is for "copying, postage, [and] telephone." The judge reduced the requested attorneys' fee by $2,766.25 (to $98,000) and expenses by $7.34 (to $13,750.00).

In our view, a reduction was called for that was more than nominal. This was a straightforward contract case with a single issue dividing the parties: the enforceability, despite the Statute of Frauds, of the extension orally agreed to by Mr. Gorney. To the circumstances there were four significant witnesses: the two attorneys (Walsh and Gorney) and the two principals (DeLeo and Gagne). The claim under G. L. c. 93A required only one additional witness, Pittorino, the purchaser of the Acton Block shares. The trial lasted but two and one-half days. The amount at issue, judging from the $340,000 purchase price, was not substantially larger than many purchases of single-family residences. The transfer of the Acton Block shares to Pittorino did not introduce remedial complications: that is, Acton Block did not disable itself from complying with the contract in the event it should be found enforceable. In short, measured in terms of the length of the trial, the difficulty of the legal and factual issues, and the amount at stake, this was an ordinary, grist-of-the-mill contract dispute, calling for no special litigation or technical skills. The time and labor devoted to the case were plainly excessive.

We do not undertake on appeal to calculate an allowable award of fees and expenses. This should be redone in the trial court because the process is essentially one of fact-finding. The judge should be guided by the familiar principle governing an award of "reasonable attorneys' fees and costs," G. L. c. 93A, § 11, sixth par., against a "party hav-

---

389 Mass. 85, 106 (1983). As attorneys' fees must be recalculated, the point can be raised now in the trial court.

ing no contractual relationship with the attorney involved, [where] the standard of reasonableness depends not on what the attorney usually charges but, rather, on what his services were objectively worth." *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 629 (1978). This objective standard requires consideration of

> "the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases."

*Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979).

It is important, finally, to keep in mind that, while G. L. c. 93A provides for penalty damages in the event of "wilful and knowing violations of § 2," the penalty finds expression in a doubling or trebling of actual damages resulting from the § 2 violation, not in awards of attorneys' fees that exceed what is reasonable in the circumstances. Thus, attorneys' fees are not thereunder the subject of doubling or trebling, so as to become punitive. The advice of Justice Kaplan in *Robbins* v. *Robbins*, 19 Mass. App. Ct. 538, 544 (1985), also bears repeating: "When fee awards appear excessive and the public hears what has been called the soft thud of mutual backpatting, respect for the administration of justice must suffer." See *Hayden* v. *Hayden*, 326 Mass. 587, 596-597 (1950).

The judgment is affirmed. The order awarding attorneys' fees and expenses is vacated, and the case is remanded for reconsideration of that award.

*So ordered.*