IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
MARCH 10, 2010 Session

## ROBERT J. DAVIDSON and wife, JEANETTE DAVIDSON
## v. RILEY WILSON

**Direct Appeal from the Chancery Court for Marion County**
**No. 7124     Jeffrey F. Stewart, Chancellor**

_____

**No. M2009-01933-COA-R3-CV - Filed June 18, 2010**

_____

This case involves a contract for the sale of real property and a subsequent verbal agreement. The trial court found that the seller breached the contract. We reverse and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Michele L. Coffman, Chattanooga, Tennessee, for the appellants, Riley Wilson

John C. Cavett, Jr., Chattanooga, Tennessee, for the appellees, Robert J. Davidson and wife, Jeanette Davidson

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

Robert and Jeanette Davidson are residents of Florida.  In 2005, the Davidsons saw an advertisement in their local newspaper regarding property for sale in Tennessee.  The seller, Riley Wilson, was also a resident of Florida.  Mr. Wilson, who had been in the real estate business for twenty years, had recently purchased a 200-acre tract of land in Tennessee, and he intended to divide the property and sell it in smaller parcels. The Davidsons contacted Mr. Wilson and arranged to meet him in Tennessee to view the property.

In early November 2005, the Davidsons met Mr. Wilson in Tennessee, and the parties drove around the property.  On November 5, 2005, the Davidsons and Mr. Wilson executed a "Contract for the Sale of Real Estate," which provided that the Davidsons would purchase "50 acres; being a portion of the Wilson Tract (203.5 acres) situated on Hwy 27 Sequatchie Tennessee Lot #2."  The purchase price was $124,750.  The Davidsons paid a $5,000 deposit to Mr. Wilson, which, according to the contract, would be retained by him if the Davidsons wrongfully failed to carry out the terms of the agreement.  The contract listed the closing date as December 5, 2005.

On the closing date of December 5, Mr. Wilson executed the closing documents in Tennessee and placed them in the mail to be sent to the Davidsons in Florida.  The warranty deed sent to the Davidsons described the property as "50.00 acres, more or less."  It also stated, "Legal description provided by parties without the benefit of a survey."  In addition, the "Commitment to Insure" prepared by the title insurance company provided that no insurance coverage was afforded as to the amount of acreage contained in the property, and there was also an exception to coverage for facts that would be disclosed by an accurate survey of the premises.  When the Davidsons received the closing documents on December 8, they were concerned by this language.  Mr. Davidson subsequently contacted Mr. Wilson regarding the concerns.  It is undisputed that both Mr. Davidson and Mr. Wilson contacted a local surveyor about obtaining a survey of the property.  However, before the survey was completed, Mr. Wilson sent a letter to the Davidsons, dated February 27, 2006, stating that he was returning their $5,000 deposit and rescinding the contract.  The Davidsons later discovered that Mr. Wilson had conveyed the property to a third party on February 24, 2006, for $150,000.

The Davidsons filed a complaint in the chancery court of Marion County, Tennessee, alleging that Mr. Wilson's actions constituted breach of contract, fraud, misrepresentation, and a violation of the Tennessee Consumer Protection Act.  At a bench trial on May 20,

2008, the trial court heard testimony from Mr. Davidson, Mr. Wilson, and another individual who had purchased land from Mr. Wilson. It was undisputed that when the parties originally signed the contract on November 5, Mr. Wilson had provided the Davidsons with a copy of a "preliminary survey" of the entire 200-acre tract. However, the lots that Mr. Wilson intended to sell separately had not been individually surveyed. Instead, Mr. Wilson penciled in boundary lines on the overall survey, pointed to landmarks when the parties viewed the property, and provided the buyers with a "legal description" of each lot. Mr. Davidson testified that he did not know how the survey issue would be addressed until he received the closing documents, and he said that he was concerned by the exceptions in the title insurance paperwork once he received those documents. The parties had several conversations after the Davidsons received the closing documents. However, their testimony conflicted regarding the nature and extent of those conversations.

Mr. Davidson testified that when he called Mr. Wilson after receiving the closing documents to discuss his concerns, Mr. Wilson agreed to have a survey done before closing and even said that he would contribute $1,000 toward the cost of obtaining the survey. According to Mr. Davidson, Mr. Wilson indicated that he would make arrangements with a surveyor after he returned from a trip to California. When the parties spoke again a couple of weeks later, Mr. Wilson allegedly instructed Mr. Davidson to "go ahead and order the survey" from Clarence Howard, a local surveyor. Mr. Davidson testified that after he contacted the surveyor recommended by Mr. Wilson, he called Mr. Wilson again and informed him that the surveyor said that it would be a couple of months before he could get started due to the winter weather. According to Mr. Davidson, he told Mr. Wilson that the surveyor was supposed to call when he was going to begin, and that the surveyor would be expecting a check up front, although the price was not yet "set in stone." Mr. Wilson then allegedly told Mr. Davidson that he would just split the cost of the survey with him "50/50." Mr. Davidson testified that this conversation took place around the first or second week in January of 2006, and that Mr. Wilson did not express any concern about the fact that the closing date had passed. According to Mr. Davidson, *he* was somewhat concerned about the past closing date, but Mr. Wilson assured him that "it happens all the time" and said not to worry about it. Mr. Davidson testified that in the following weeks, he contacted the surveyor a couple of times, but he did not have any further contact with Mr. Wilson because he understood that they were simply waiting on the survey to be completed. Mr. Davidson said that the next communication he received from Mr. Wilson was the letter stating that Mr. Wilson was rescinding the contract and returning their $5,000 deposit. Mr. Davidson stated that he received the letter on March 3, and that he immediately called Mr. Wilson to ask what was going on. According to Mr. Davidson, Mr. Wilson basically said that he was tired of waiting and that he was putting the property back on the market. Mr. Davidson said he later learned that Mr. Wilson had already sold the property and cancelled the order for the survey prior to sending the rescission letter.

Mr. Davidson testified that all of the parties' conversations were by telephone and that they did not execute a new contract or other document. He said he did not think that it was necessary to have another written contract because the parties continued to talk after the scheduled closing date passed, and they had both spoken with the surveyor. Mr. Davidson said that Mr. Wilson never seemed to have a problem with waiting on the survey, and that the parties' conversations were all very cordial until Mr. Wilson sent the rescission letter.

Mr. Wilson's version of the events was quite different. He acknowledged that because he did not mail the closing documents from Tennessee until December 5, there was no way that the sale could close on the scheduled closing date. He explained that his closings did not always occur as scheduled and that there was usually a delay of at least one day. He further testified, however, that he did not extend the Davidsons' closing date, and he claimed that he insisted that the Davidsons go ahead and close on the transaction. He testified that when Mr. Davidson contacted him with his concerns about the lack of a survey, he told Mr. Davidson that he would send him a "survey memorandum," which he often provided to his buyers, stating that the Davidsons could obtain a survey of the property within one year, and in the event that there was a discrepancy in the acreage, the price could be adjusted upward or downward accordingly. Mr. Wilson produced a copy of the survey memorandum that he allegedly faxed to Mr. Davidson on or about December 8. It was signed by Mr. Wilson and dated December 8, but the space designated for the buyer's signature was left blank. In short, Mr. Wilson said that he wanted Mr. Davidson to "close his escrow" and then the parties would "resolve the issues" after the survey was performed. However, Mr. Wilson said that Mr. Davidson refused to close on the transaction or place his purchase money in escrow despite his repeated requests that he do so. Mr. Wilson claimed that he told the Davidsons on more than one occasion that if they did not "close the escrow" he was going to sell the property to someone else, but they refused to pay.

Mr. Wilson initially testified that he did not agree to do anything regarding obtaining a survey of the property. He denied agreeing to pay $1,000 or one-half of the cost of the survey. When asked whether he called Clarence Howard, the local surveyor, and instructed him to survey the property, he simply stated, "I did not." Upon further questioning, however, Mr. Wilson conceded that he did call the surveyor around December 8, 9, or 10 to try to get a better deal on a survey for the Davidsons. According to Mr. Wilson, Mr. Davidson was given a quote of five to six thousand dollars for the survey, so he contacted the surveyor and explained that only two boundary lines needed to be surveyed, and the surveyor then agreed to do it for $3,500. Mr. Wilson acknowledged that he made this call after the Davidsons had already refused to pay their money into escrow. Mr. Wilson said he then called Mr. Davidson back and told him the new price. Mr. Wilson claimed that he again told Mr. Davidson that if he did not close the escrow, he was going to sell the property, and that Mr. Davidson again refused. Mr. Wilson said he told Mr. Davidson that the contract had expired

-4-

and that he expected Mr. Davidson to complete the transaction "as soon as possible."

When asked why he did not "call the deal off" when the Davidsons refused to pay their money into escrow, Mr. Wilson said he was still hoping that they would. Mr. Wilson similarly testified that when he was informed about another potential buyer in January, he told the interested party that he had an outstanding deal because he was still willing to close the transaction with the Davidsons. The interested party also testified that when he contacted Mr. Wilson after Christmas, Mr. Wilson told him that he had no more property available. Mr. Wilson entered into a contract to sell the property to the third party on February 14, 2006, but the contract stated that it was a "backup offer." Mr. Wilson testified that he inserted the "backup offer" language because he was still hoping that the Davidsons would close, and he wanted the third party to know that there was an offer pending and that he was trying to get it closed. Mr. Wilson testified that he did not send the rescission letter sooner because he was still hoping that the Davidsons would complete the transaction.

When asked about the "survey memorandum" relied upon by Mr. Wilson, Mr. Davidson testified that he had never seen the document before trial. Mr. Davidson said the parties did orally agree to adjust the price if the survey revealed that there were more or less than fifty acres. However, he insisted that the parties never agreed that he would just sign the documents and pay the money before the survey was complete. Mr. Davidson admitted that Mr. Wilson *asked* him to place the money in escrow, but he said that he refused because he did not feel comfortable doing so. Mr. Davidson explained that he was concerned about what the survey would reveal and whether the title insurance company would issue a policy to his satisfaction. Mr. Davidson said he had previously told Mr. Wilson, when his financing was approved, that the money was in a separate account at the bank, and that Mr. Wilson could contact the bank, or the bank could send him a letter, so that he would know the money was there. According to Mr. Davidson, Mr. Wilson never mentioned that he had another buyer interested in the property. In sum, Mr. Davidson testified that the parties simply agreed to have a survey completed before the closing was completed. When the survey was done, he said, the parties would set the closing.

The trial court entered a final order on December 12, 2008, which included the following relevant findings:

> The Plaintiffs and the Defendant entered into a contract for the sale of real estate on November 5, 2005. The contract called for the Defendant to sell to the Plaintiffs "50 acres: being a portion of the Wilson Trac[t] (203.5 acres) situated on Highway 27 Sequatchie, Tennessee Lot 2." The sales price was $124,750. The closing was set for December 5, 2005.
> Following the execution of the contract, the Plaintiffs returned to their

home in Florida, secured financing for the purchase, and advised the Defendant that the financing had been secured.

The Defendant hired a title insurance company to prepare closing documents. The plaintiffs did not receive these documents until after December 5, 2005. Upon review of the documents, the Plaintiffs were concerned about the language in two of the documents. First, the deed described the property to be conveyed as "50 acres more or less" which varied from the terms of the contract which called for the conveyance of "50 acres." Second, the title insurance commitment indicated that the policy would not insure the Plaintiffs as to the quantity of land. The Plaintiffs' concerns resulted in an agreement by the parties to have the property surveyed. The Defendant suggested a surveyor. However the parties were advised by the surveyor that he could not specify an exact total cost or date of completion.

Over time the Plaintiffs and the Defendant held discussions regarding the closing. However, at no time was an actual deadline set. In February 2006, the Defendant was introduced to another buyer (Mr. Burgeson). He entered into a contract with Burgeson on February 14, 2006. This contract, prepared by Defendant, said that it was "a backup offer and if seller (Riley Wilson) cannot deliver good title then the buyer agrees to accept that fact and further agrees to take no further action legal or otherwise." This language was initialed by both parties to the contract. The sales price in this contract was $150,000.00. The "backup" language in the contract prepared by the Defendant shows that the Defendant still considered the contract with the Plaintiffs to be valid and enforceable. The Defendant did not inform the Plaintiffs of the new contract.

Ten (10) days after the Defendant signed the contract with Burgeson – on February 25, 2006 – the Defendant executed a deed to Burgeson. The Defendant gave no notice of the conveyance to the Plaintiffs at that time. Sometime after the closing with Burgeson, the Defendant advised the Plaintiffs that he was going to sell the property (even though he had already sold it).

Based upon the foregoing it is the Court's opinion that the Defendant breached the contract. The Defendant breached the contract by selling the property to a third party despite the existence of a valid and enforceable contract between him and the Plaintiffs. Additionally, the Defendant did not supply the Plaintiffs with closing documents in accordance with the sales contract – i.e., there was a discrepancy between the quantity of land specified in the contract and the quantity specified in the proposed deed. And by both his actions and his words, he agreed to continue the closing until such time as the Plaintiffs' concerns with the closing documents could be adequately addressed.

The Court finds that the measure of damages is the benefit of the bargain, which is the difference between the purchase price in the Contract between the parties – $124,750.00 – and the purchase price in the contract between the Defendant and Burgeson – $150,000.00[–] or $25,250.00.

The trial court also awarded the Davidsons their attorneys' fees, but it denied their claim pursuant to the Tennessee Consumer Protection Act.

## II.   ISSUES PRESENTED

Mr. Wilson timely filed a notice of appeal and presents the following issues for review:

1.   Whether the trial court erred by finding that there was an enforceable contract between the parties; and
2.   Whether the trial court erred by finding that Defendant breached the contract and that Plaintiffs were entitled to damages, including the benefit of the bargain, attorneys' fees, and costs.

For the following reasons, we reverse the decision of the chancery court.

## III.   STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2009); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* We "will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). "This rule applies regardless of whether the finding of credibility is express or implied." *Parker v. Henderson County*, No. W2009-

00975-COA-R3-CV, 2010 WL 377044, at *7 (Tenn. Ct. App. Feb. 4, 2010) (citing *Herbison v. Herbison*, No. M2008-00658-COA-R3-CV, 2009 WL 1634914, at *6 (Tenn. Ct. App. June 10, 2009)). "The trial court's findings on credibility and weight of the evidence may be inferred from the manner in which the court resolves the conflicts in the testimony and decides the case." ***Interstate Mech. Contractors, Inc. v. McIntosh***, 229 S.W.3d 674, 678-79 (Tenn. 2007) (citing *Rhodes v. Capital City Ins. Co.*, 154 S.W.3d 43, 46 (Tenn. 2004)). However, we review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

On appeal, Mr. Wilson argues that the parties' conversations after the scheduled closing date were merely an attempt to negotiate an oral modification of the contract, and that there was never a meeting of the minds to support an enforceable agreement. He further contends that any oral modification of the parties' contract is unenforceable because, among other things, there is no writing to satisfy the statute of frauds.

The trial court, after observing the parties' conflicting testimony, concluded that there was in fact "an agreement by the parties to have the property surveyed," and that "by both his actions and his words, [Mr. Wilson] agreed to continue the closing until such time as the Plaintiffs' concerns with the closing documents could be adequately addressed." The court clearly credited Mr. Davidson's testimony over Mr. Wilson's, and after reviewing the record, we find no clear and convincing evidence to contradict the trial court's credibility determination. To the contrary, there is ample evidence to support the trial court's finding that the parties verbally agreed to have the property surveyed and to continue the closing date until the Davidsons' concerns were addressed.

However, that does not end our inquiry in this case. The trial court did not expressly make any finding regarding the statute of frauds. On appeal, the Davidsons argue that Mr. Wilson waived his right to rely upon the statute of frauds by failing to raise it as an affirmative defense in his answer. The statute of frauds is expressly enumerated in Tennessee Rule of Civil Procedure 8.03 as an affirmative defense that must be timely raised, and it was not raised in Mr. Wilson's answer. "Affirmative defenses not properly raised before the trial court generally do not merit consideration on appeal." ***Madden Phillips Constr., Inc. v. GGAT Dev. Corp.***, No. W2008-02350-COA-R3-CV, 2009 WL 3064898, at *9 n.9 (Tenn. Ct. App. Sept. 25, 2009) *perm. app. denied* (Tenn. Mar. 15, 2010) (citing *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn. Ct. App. 1990)). However, "[a]n exception lies for issues not raised in the pleadings, but tried by implied or express consent

of the parties." **Id.** (citing Tenn. R. Civ. P. 15.02; *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980)).  During his opening statements, counsel for Mr. Wilson suggested that the Davidsons could not demonstrate an extension of the contract or an additional contract because there was "no writing to that effect."  He then cross-examined Mr. Davidson regarding whether the parties ever executed a new contract or reduced anything to writing, and he also questioned Mr. Wilson regarding the lack of a writing. Then, at the conclusion of the testimony, Mr. Wilson's counsel orally moved to amend his pleadings pursuant to Tennessee Rule of Civil Procedure 15.02 to raise the statute of frauds as an affirmative defense.  The trial judge stated, "There being no objection, I'll allow you to do it."  After a brief discussion, counsel for the Davidsons replied, "Okay. I don't object." "The determination of whether there was implied consent rests in the discretion of the trial judge, whose determination can be reversed only upon a finding of abuse."  *Zack Cheek Builders*, 597 S.W.2d at 891.  Here, we find no error, as the parties at least impliedly, if not expressly, consented to try the statute of frauds issue.  Thus, we find that the issue was properly raised in the trial court, and we will consider it on appeal.

> Tennessee's statute of frauds provides, in relevant part:
> No action shall be brought: . . . [u]pon any contract for the sale of lands . . . unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.  In a contract for the sale of lands, . . . the party to be charged is the party against whom enforcement of the contract is sought.

Tenn. Code Ann. § 29-2-101(a)(4).[1]  The requirement of a written memorandum is not satisfied by a document "disclosing merely that a contract had been made, without showing what the contract is." *Lambert v. Home Fed. Sav. & Loan Ass'n*, 481 S.W.2d 770, 773 (Tenn. 1972).  "The general rule is that the memorandum, in order to satisfy the statute, must contain the essential terms of the contract, expressed with such certainty that they may be understood from the memorandum itself or some other writing to which it refers or with which it is connected, without resorting to parol evidence." *Id.* Regarding the requirements

---

[1] We note that the statute of frauds only prohibits an "action" from being brought on a land sale contract without a writing.

> The statute of frauds, however, does not render oral contracts for the sale of land void *ab initio*.  Instead, such contracts are merely voidable at the election of either party.  If one of the parties to the contract fails to raise the statute of frauds as a defense, or if the parties consent, the court is required to enforce an oral contract for the sale of land.

*Anderson v. Hacks Crossing Partners*, 3 S.W.3d 482, 486 (Tenn. Ct. App. 1999) (citations omitted).

of a writing necessary to support a valid and enforceable sale of land under the statute, "'[n]o particular form of words or any artificial arrangement of them is required, but the fact of a sale and its terms, embracing a designation of the parties to it, and the land sold, must appear with reasonable certainty in the writing relied upon, or some other to which it refers.'" ***Brigadoon Partners, LLC v. Hughes***, No. E2007-00267-COA-R3-CV, 2008 WL 538990, at *2 (Tenn. Ct. App. Feb. 27, 2008) (citing *Case v. Brier Hill Collieries*, 235 S.W. 57, 59 (Tenn. 1921)).

In Tennessee, like an initial contract, "a modification of a contract for the sale of real estate must be in writing." ***Hill v. Goodwin***, 722 S.W.2d 668, 671 (Tenn. Ct. App. 1986) (citing *Lambert*, 481 S.W.2d 770). On appeal, the Davidsons argue that their claim is not barred by the statute of frauds because they "are not relying upon any contractual term outside the contract itself." Their position, as we understand it, is that they are simply seeking to enforce the original contract. We find that argument unavailing. The trial court found a subsequent verbal agreement "to have the property surveyed" and "to continue the closing until such time as the Plaintiffs' concerns with the closing documents could be adequately addressed." Mr. Davidson testified that the parties verbally agreed to adjust the price upward or downward if the survey revealed that there were "47 acres or 53 acres or whatever."

We note that some jurisdictions allow oral modifications of real estate contracts if the oral agreement is limited to changing only the method of performance of the contract, such as its closing date, reasoning that the method of performance is not an essential term of the contract. When deciding "whether an alleged oral agreement to extend the time for closing [a] sale under a real estate purchase contract is an agreement within the statute of frauds," the Court of Appeals of Idaho explained:

> The authorities examining this issue are not unanimous. Some jurisdictions apply the general rule that a contract within the statute of frauds cannot be orally modified, and hold that a parole agreement extending time for performance of such a contract is unenforceable.[2] However, most of the recent cases addressing the issue recognize that an oral agreement to substitute the mode or time of performance of an executory contract required to be in writing is valid and binding, provided that no other material term is changed and the

---

[2] *See, e.g., Choctaw Home Builders, Inc. v. Lena, Inc.*, 223 So.2d 23 (La. App. 1969); *Hawkins v. Studdard*, 132 Ga. 265, 63 S.E. 852 (1909). *See also* 72 Am. Jur. 2d *Statute of Frauds* § 280, p. 798-99 (1974); 37 C.J.S. *Statute of Frauds* § 232(b), p. 735-37 (1943); Restatement (Second) of Contracts §§ 138, 150 comments (a), (d) (1981).

agreement is made before the expiration of the written contract.[3] The cases employing this rule generally draw a distinction between the contract, which the statute of frauds requires to be in writing, and its performance, to which the statute does not apply.

***Kelly v. Hodges***, 811 P.2d 48, 50-52 (Idaho Ct. App. 1991) (footnotes in original); *see also* ***Davis v. Patel***, 794 S.W.2d 158, 160-61 (Ark. Ct. App. 1990) (noting a "marked difference . . . between a modification of a written contract in the essentials required to meet the statute of frauds and an agreement for a substituted method of performance not within the statute."); ***In re Estate of Yates***, 845 A.2d 714, 720 (N.J. Super. Ct. App. Div. 2004) ("Oral agreements which do no more than extend the time for performance of contracts which otherwise satisfy the Statute of Frauds are valid unless the contract has made time of the essence. Thus, the oral agreement . . . putting off the closing was legally binding.") (citations omitted).

In this case, however, the parties' oral agreement would be unenforceable under either view, because it did not merely change the time for performance of the contract. In addition to extending the closing date until the Davidsons' concerns with the closing documents could be adequately addressed, the parties verbally agreed to obtain a survey of the land described and to adjust the purchase price based on the results of the survey. We conclude that this oral agreement changed the essential terms of the contract, such that it was required to be in writing pursuant to the statute of frauds.

The Davidsons do not argue that an exception to the statute of frauds should apply. In Tennessee, "part performance of a parol contract for the sale of land will not take the agreement out of the statute of frauds." ***Baliles v. Cities Serv. Co.***, 578 S.W.2d 621, 624 (Tenn. 1979). "The harshness of this rule has been mitigated by the application of the doctrine of equitable estoppel in exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud." ***Id.*** However, "equitable estoppel only applies in extraordinary cases as a bar to the Statute of Frauds." ***York v. Batson***, No. M2007-02418-COA-R3-CV, 2008 WL 4254590, at \*5 (Tenn. Ct. App. W.S. July 17, 2008) (citing *Autry v. Boston*, No. E2005-01030-COA-R3-CV, 2006 WL 1132075 (Tenn. Ct. App. Apr. 28, 2006)); *see, e.g.*, ***Devereaux v. Devereaux***, No.

---

[3] *See, e.g., Davis v. Patel*, 32 Ark. App. 1, 794 S.W.2d 158 (1990); *Rex Lumber Co. v. Acton Block Co.*, 29 Mass. App. Ct. 510, 562 N.E.2d 845 (1990); *Patten v. Nagy*, 86 A.D.2d 890, 447 N.Y.S.2d 334 (1982); *Bower v. Davis & Symonds Lumber Co.*, 119 N.H. 605, 406 A.2d 119 (1979); *Wolf v. Crosby*, 377 A.2d 22 (Del. Ch.1977); *Adams v. Thompson*, 87 N.M. 113, 529 P.2d 1234 (1974); *Poznik v. Urton & Co.*, 30 Colo. App. 475, 496 P.2d 1073 (1972); *Dracopoulas v. Rachal*, 411 S.W.2d 719 (Tex. 1967). See also 72 Am. Jur. 2d *Statute of Frauds* § 280, p. 798 (1974); 37 C.J.S. *Statute of Frauds* § 232(b), p. 735-37 (1943).

E2008-00861-COA-R3-CV, 2009 WL 1564802, at *6 (Tenn. Ct. App. Jun. 5, 2009) (applying equitable estoppel where plaintiffs moved to Tennessee from New Jersey and made substantial expenditures of time and money to improve property in reliance on a purported deed from plaintiff's father and his conduct). The doctrine of estoppel, as an exception to the statute of frauds, "should not be applied too liberally lest the exception swallow the rule." *Johnson v. Allison*, No. M2003-00428-COA-R3-CV, 2004 WL 2266796, at *8 (Tenn. Ct. App. Oct. 7, 2004). "The doctrine of equitable estoppel is not favored under Tennessee law, and the party asserting the doctrine bears the burden of proving each and every element[4] necessary to such claim." *Burks v. Elevation Outdoor Adver., LLC*, 220 S.W.3d 478, 490 (Tenn. Ct. App. 2006) (citing *Robinson v. Tenn. Farmers Mut. Ins. Co.*, 857 S.W.2d 559, 563 (Tenn. Ct. App. 1993); *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986)). "The burden of proof is on the party seeking to invoke equitable estoppel." *Thornton v. Marcum*, No. E2007-01326-COA-R3-CV, 2008 WL 836368, at *3 (Tenn. Ct. App. Mar. 31, 2008) (citing *Bokor*, 722 S.W.2d at 676). The doctrine of equitable estoppel has been described as "a shield a plaintiff can raise against the defense of the statute of frauds." *Seramur v. Life Care Ctrs. of America, Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885, at *5 (Tenn. Ct. App. Apr. 2, 2009). Still, "not raising or briefing the issue before the trial court or the Court of Appeals is grounds for waiver of review." *Osborne*, 130 S.W.3d at 774 n.6 (citing *Alexander v. Armentrout*, 24 S.W.3d 267 (Tenn. 2000)). Because the Davidsons did not raise

---

[4] As the Court explained in *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004):

The doctrine of equitable estoppel requires evidence of the following elements with respect to the party against whom estoppel is asserted:

(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive of the real facts.

*Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990) (quoting *Callahan v. Town of Middleton*, 41 Tenn.App. 21, 292 S.W.2d 501, 508 (1954) (citation omitted)). Equitable estoppel also requires the following elements with respect to the party asserting estoppel:

(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) Reliance upon the conduct of the party estopped; and (3) Action based thereon of such a character as to change his position prejudicially.

*Id.*

-12-

equitable estoppel during the trial court proceedings or on appeal, we deem the issue waived. However, it is our opinion that the compelling circumstances necessary to support equitable estoppel are simply not present in this case. As stated above, Tennessee courts "consistently have refused to enforce an oral contract for the sale of land on the basis of part performance alone," ***Baliles***, 578 S.W.2d at 624, and the Davidsons have not proven that they sufficiently changed their position in reliance on the agreement to warrant the application of equitable estoppel.

## V. CONCLUSION

For the aforementioned reasons, we reverse the decision of the chancery court and remand for entry of an order dismissing the Davidsons' complaint. Costs of this appeal are taxed to the appellees, Robert J. Davidson and Jeanette Davidson, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.